# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 19, 2012

No. 10-20497

Lyle W. Cayce
Clerk

A. L. BALLARD,

Plaintiff-Appellant

v.

DEVON ENERGY PRODUCTION COMPANY, L.P.,

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, BENAVIDES, and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant, A. L. Ballard ("Ballard"), successor in interest to Kilroy Properties, Incorporated ("Kilroy"), sued Defendant-Appellee Devon Energy Production Company ("Devon"), successor in interest to Wise Oil Company ("Wise Oil") for breach of a provision in an American Association of Petroleum Land Men ("AAPL") Model Form Operating Agreement ("Operating Agreement") that was an exhibit to and incorporated by reference in a May 1971 Farmout Agreement (collectively "Joint Operating Agreement" or "JOA") between Kilroy and Wise Oil.[1]

---

[1] Ballard's suit was brought in federal court pursuant to diversity jurisdiction under 28 U.S.C. § 1332. Ballard later sought leave to amend his complaint to add a breach of fiduciary duty claim, but the district court denied its motion.

No. 10-20497

That agreement memorialized a joint venture for the drilling of shallow oil wells pursuant to numerous mineral leases assigned in the Farmout Agreement covering, in the aggregate, almost a quarter million acres in ten Montana townships.[2]  Ballard's lawsuit turns on the interpretation of one sentence in the multi-paragraph "Area of Mutual Interest" ("AMI") provision of the Operating Agreement, which is Exhibit "B" to the Farmout Agreement.  In answering Ballard's complaint, Devon asserted that the AMI provision had expired automatically under its own three-year time limit.  The district court agreed with Devon and granted a take-nothing summary judgment against Ballard. We affirm that summary judgment, albeit for reasons that differ from those of the district court.

I.

## FACTS AND PROCEEDINGS

### A.  Facts

Ballard's and Devon's predecessors signed the JOA on May 31, 1971.  As noted, the JOA contains a Farmout Agreement and several attached exhibits — one of which is the Operating Agreement — pertaining to drilling on premises covered by oil and gas leases on described tracts of land in Montana.  The contract documentation was presumably prepared by Devon's predecessor, Wise Oil, or by its law firm, employing a model form disseminated by the AAPL.  As thus promulgated, the AAPL printed form Operating Agreement consisted of 31 articles or sections, the first 30 of which contain substantive provisions, but the last — "31. Other Conditions, If Any, Are:" — was left completely blank, in anticipation that the parties using it would supplement the printed agreement by adding their own provisions in article 31 to express any unique supplemental features of the negotiated transaction that were not contained in the first 30 sections.

---

[2] A regular township comprises 36 sections, each of which is one square mile or 640 acres, thus 230,040 acres covered by ten townships.

No. 10-20497

In confecting the instant contract, several of the first 30 of the printed articles in the Operating Agreement were revised, modified, and, in some instances, eliminated altogether, by the use of typewritten changes, strike-outs, and the like. The final article, "31," was entirely typewritten and contains six lettered sections (a seventh section — "G." if in alphabetical order — was apparently omitted inadvertently and does not affect this case). The sixth of article 31's lettered sections, designated "F. Area of Mutual Interest:" (hereafter, "31.F"), consists of five separate or "grammatical" paragraphs.[3] The first two comprise multiple sentences; each of the last three consists of a single sentence. None of these five paragraphs is lettered or numbered and none has a descriptive title.

31.F designates the AMI as the ten-township area outlined on a map attached to the Farmout Agreement and identified as "Exhibit 'E'". Together, the first three of 31.F's grammatical paragraphs define the AMI, state the results of the acquisition of additional oil and gas leases or mineral interests that lie within the AMI, and explain what will happen if less than all of the parties should elect to participate in such a future acquisition. Thus, those first three grammatical paragraphs of 31.F. provide the effects of any and all such future *acquisitions.* Of importance here, these acquisition provisions specify that a party who subsequently acquires a minimal lease or interest in land lying within the AMI must give the other parties an opportunity to participate in the interest thus acquired. Ballard claims that Devon has breached its contract by failing to inform Ballard about new acquisitions in the AMI.

By contrast, the fourth grammatical paragraph of 31.F states what will happen if "all leases within a township" — of which ten constitute the AMI — are

---

[3] "A distinct division of a written work or composition that expresses some thought or point relevant to the whole but is complete in itself, *and may consist of a single sentence* or several sentences." (emphasis added) THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (Houghton Mifflin Co. 1976).

No. 10-20497

*surrendered* or *not maintained*, either by all of the parties to the JOA or by any individual party. This fourth grammatical paragraph of 31.F specifies that a party will lose its future AMI rights as to an entire township if it surrenders or fails to maintain its lease or leases covering property in that particular township. Thus, the three initial grammatical paragraphs of 31.F. contain "acquisition" provisions, but the fourth contains a "surrender" provision.

This action turns on the fifth and final single-sentence paragraph of 31.F which contains a three-year automatic expiration provision that states:

31.  OTHER CONDITIONS, IF ANY, ARE:

. . . . . . .

F.     Area of Mutual Interest:

. . . . . . .

> The above subparagraph of 31F shall be effective from the date of the Farmout Agreement to which this Operating Agreement is attached and shall terminate and be of no further force and effect after three years from the date of this operating agreement.

It is undisputed that "[t]he above subparagraph of 31 F" expired on May 31, 1974 because the Operating Agreement is dated May 31, 1971. The parties vigorously dispute, however, just what the phrase "[t]he above subparagraph of 31 F" applies to, *viz.*, whether it calls for the expiration of the entire subparagraph F. of paragraph 31 — both its acquisition provisions and its surrender provision — or only the fourth grammatical paragraph of F., *i.e.*, the surrender provision only.

**B.  Proceedings**

In 2005, Ballard sued Devon in federal court pursuant to diversity jurisdiction for failing to offer him the opportunity to participate in various recent oil and gas lease acquisitions in the AMI, as generally required under acquisition provisions of 31.F. Ballard insisted that the phrase "[t]he above subparagraph of 31 F" referred only to the *surrender* provision, *i.e.*, the fourth grammatical

4

No. 10-20497

paragraph of 31.F, so that only the surrender provision had expired in 1974, three years after the agreement was signed. Ballard contended that the rest of 31.F, being the acquisition provisions, remains in full force and effect.[4] He subsequently moved to amend his complaint to add a claim of breach of fiduciary duty.

Devon countered that the phrase in question, "[t]he above subparagraph of 31 F," applies to the entirety of 31.F, so that all provisions of 31.F — both acquisition and surrender — had expired simultaneously on May 31, 1974. In Devon's view, the inclusion of the preposition "of" in the phrase was at most a typographical error—but even if it were not, Devon argued, a plain reading of the agreement as a whole, and the transaction memorialized in it, shows that the phrase applies to the entirety of 31.F, not just the surrender provision.

The district court denied Ballard leave to amend and rejected his interpretation of the AMI provision. The district court concluded, as a matter of Montana law, that the only practical interpretation of "[t]he above subparagraph of 31 F" confirms that the preposition "of" was a typographical error and that the parties unambiguously intended for the three-year limitation to apply to the entirety of 31.F. The court's conclusion was based on summary judgment evidence regarding the purpose of the agreement, the operating history of the parties, and the multiple affidavits of the attorney who drafted the agreement. The district court also concluded that because Ballard knew as early as 1976 that the AMI provision had expired and his delay in bringing the suit prejudiced Devon, the suit was barred by the doctrine of laches.[5]

---

[4] Because there are no additional temporal limits with regard to 31.F, as further discussed below, Ballard's interpretation would mean that the first three paragraphs or acquisition provisions of 31.F remains effective *ad infinitum*.

[5] *See Ballard v. Devon La. Corp.*, No. 05-CV-3454, 2010 WL 2521391, at *2–4 (S.D. Tex. June 22, 2010).

No. 10-20497

Finding no genuine dispute of material fact regarding Devon's liability, the district court granted summary judgment and entered final judgment for Devon. Ballard appeals the district court's denial of his motion to amend the complaint and summary judgment in favor of Devon.

## II.

## ANALYSIS

### A. Leave to Amend

Whether to grant leave to amend a complaint "is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion."[6] "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment."[7]

In this case, Ballard filed his first complaint in September 2005 and did not seek leave to amend until January 2009. In doing so, he sought to add a claim that Devon owed him a fiduciary or quasi-fiduciary duty under the AMI provision. Given Ballard's failure to sufficiently explain his three-year delay in requesting leave to amend and the claim's apparent lack of merit, we cannot say that the district court abused its discretion in denying Ballard leave to amend his complaint to add such a claim.

---

[6] *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 644 (5th Cir. 2007) (citation omitted).

[7] *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) (citation omitted); *see also Lozano*, 489 F.3d at 644 ("[T]he district court may consider that the moving party failed to take advantage of earlier opportunities to amend.").

No. 10-20497

## B. Summary Judgment

### 1. Standard of Review

We review a district court's grant of summary judgment *de novo*, applying the same legal standards as the district court.[8] Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.[10] "[A]ll facts and evidence must be taken in the light most favorable to the non-movant."[11] To avoid summary judgment, however, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial.[12] We are "not limited to the district court's reasons for its grant of summary judgment" and "may affirm the district court's summary judgment on any ground raised below and supported by the record."[13]

### 2. Montana Law and Contract Interpretation

---

[8] *United States v. Caremark, Inc.*, 634 F.3d 808, 814 (5th Cir. 2011).

[9] FED. R. CIV. P. 56(c).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986).

[11] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007).

[12] *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir.2006).

[13] *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 478 (5th Cir. 2008).

No. 10-20497

Like the district court before us, we apply Montana law to the parties' dispute, in accordance with the choice-of-law rules of the forum state, here Texas.[14] The parties do not dispute that Montana substantive law applies to this case.

In Montana, a court must interpret a contract "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."[15]  When, as in here, the contract is in writing, "the intention of the parties is to be ascertained from the writing alone if possible."[16] Moreover, if "[t]he language of a contract is . . . clear and explicit and does not involve an absurdity," the language governs the interpretation of the contract.[17]

Whether an ambiguity exists in a contract is a question of law that must be determined on an objective basis.[18]  Contractual language is unambiguous if it is "*reasonably* susceptible to *only one* construction".[19]  When that is the case, it is "the

---

[14] In Texas, "[w]hen evaluating choice-of-law issues in contractual disputes, we consider the facts of the case under the 'most significant relationship' test set forth in section 188 of the Restatement (Second) of Conflicts of Laws." *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex. 1997).  Under the section 188 test, the court "determine[s] contractual rights and duties by the law of the state with the most significant relationship to the transaction and the parties." *Id.*  "When, as here, the parties have not expressly chosen the applicable law, we consider  . . . contacts" such as the place of contracting, negotiation, performance, and the location of the contract's subject matter. *Id.*  All of these factors counsel for the application of Montana substantive law to this case. *See also Ellis v. Trustmark Builders, Inc.*, 625 F.3d 222, 225 (5th Cir. 2010) ("When sitting in diversity, we apply the choice-of-law rules of the forum state . . . to determine which state's substantive  law should apply." ).

[15] MONT. CODE § 28-3-301.

[16] *Id.* § 28-3-303.  *See also* MONT. CODE § 28-2-905(1) ("Whenever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms.").

[17] *Id.* § 28-3-401.

[18] *Mary J. Baker Revocable Trust v. Cenex Harvest States, Coop., Inc.*, 164 P.3d 851, 857 (Mont. 2007) (citation omitted).

[19] *Id.* (emphasis added).

duty of the court . . . to apply the language as written."[20]  Conversely, contractual language is ambiguous "only if the language is susceptible to at least two *reasonable* but conflicting meanings."[21]  Only if the contractual language is determined to be ambiguous must "a factual determination . . . be made as to the parties' intent in entering into the contract."[22]  Thus, under Montana law, two sequential questions must be answered to test for ambiguity:  First, whether two or more different meanings or interpretations have been proffered by the opposing proponents; second, if so, whether at least two of the proffered meanings or interpretations is "reasonable."

In determining the meaning of a contract's language, the court "view[s] the contract as a whole so as to give effect to every part if reasonably practicable, each clause helping to interpret the other."[23]  The court "will not isolate tracts, clauses, or words, but rather . . . grasp[s] the instrument by its four corners and in the light of the entire instrument . . . ascertain the parties' intent."[24]  With these principles of Montana law in mind, we turn to the contractual language here in dispute.

### 3. Application

First, we cannot sanction the district court's approach to construing the AMI provision.  That court relied principally on extrinsic evidence to conclude that the

---

[20] *Id.*

[21] *Id.* (emphasis added).

[22] *Id.* (internal quotations omitted); *see also* MONT. CODE § 28-3-306(1) ("If the terms of a promise are in any respect ambiguous or uncertain, the promise must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.").

[23] *K&R P'p v. City of Whitefish*, 189 P.3d 593, 600 (Mont. 2008) (quoting MONT. CODE § 28-3-202).

[24] *Id.* (internal quotation marks and citation omitted); *see also Sandtana, Inc. v. Wallin Ranch Co.*, 80 P.3d 1224, 1229 (Mont. 2003) (stating it "is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties").

parties' obligations under that provision had expired. Such an approach is directly contrary to Montana's controlling analytical method of contract construction. To discern the parties' mutual intent, a court applying Montana law must begin with the pure language of the contract. Only if the court determines that the contract's language is ambiguous may it consider extrinsic evidence to divine the parties' intent.[25] Here, the district court considered extrinsic evidence to determine the parties' mutual intent without *first* considering whether that intent could be ascertained from the writing alone, as required.[26]

In our *de novo* review of Devon's motion for summary judgment, we begin — and, in this case, end — with the four corners of the entire JOA, including all incorporated attachments. When we do so, and ultimately focus on the language of the fifth grammatical paragraph of 31.F in the context of the contract as a whole, we conclude that (1) the language is unambiguous, and (2) the three-year expiration applies to the entirety of 31.F. To be sure, the drafting of the JOA is, at times, inconsistent and confusing.[27] Such drafting notwithstanding, however,

---

[25] *See Baker Revocable Trust*, 164 P.3d at 866–67 ("[I]f the court determines that an ambiguity is present in the instrument, then the extrinsic evidence may be introduced at trial to allow the trier of fact to determine the intent of the parties in entering into the contract.")

[26] It is true that in Montana, a court may consider "objective evidence of 'the circumstances under which [the instrument] was made'" for the limited purpose of "determining, as a preliminary matter, whether the instrument contains *an ambiguity*." *Baker Revocable Trust*, 164 P.3d at 872 (emphasis added) (quoting MONT. CODE § 1-4-102). But here, the district court relied on extrinsic evidence to support its conclusion that the contractual language was *unambiguous*. This it may not do. *See id.* at 864 ("If the court determines that the instrument contains no ambiguity, then the extrinsic evidence may not be considered further.") (citation omitted). Similarly, *Brewer v. Hawkinson*, 221 P.3d 643 (Mont. 2009), is distinguishable because there the Montana Supreme Court's concludes that a contract was not ambiguous but contained a typographical error was made solely "by reference to the plain language" of the contract. *Id.* at 647. The district court here erred by impermissibly relying on extrinsic evidence alone to reach the same conclusion.

[27] For example, although the Table of Contents lists each of the 31 articles under the heading "Paragraph Number," that is the only place in the entire printed document that the word "Paragraph" appears —— and the lower-case version, "paragraph," never appears. In the printed body of the Operating Agreement, neither the numbers nor the verbal descriptions

No. 10-20497

a review of the transaction as documented in the contract leads to only one *reasonable* conclusion of the original parties' intent vis a vis the AMI provision.

As the first step in the test for ambiguity, we review the two conflicting interpretations proffered by the parties. Ballard contends that the fifth and final sentence of 31.F applies only to the immediately preceding fourth substantive paragraph of 31.F., *i.e.*, only to the surrender and release rule of the AMI provision. Thus, Ballard would read that final sentence of 31.F to mean that only the fourth subparagraph of the AMI provision terminated and was of no further force and effect three years after the date of the Operating Agreement, but that the preceding three paragraphs — the acquisition provisions — continued to be in effect for the entire duration of the JOA.

By contrast, Devon contends that the final, single sentence, grammatical paragraph of 31.F applies to the *entire* AMI provision, *i.e.*, to the three acquisition paragraphs *and* the one surrender paragraph, as a result of which the *entire* AMI provision — the entirety of *subparagraph* F of *paragraph* 31 — expired on its own terms after three years, *i.e.*, on May 31, 1974. Thus, Devon reads the final sentence of 31.F to mean that all four substantive paragraphs of the AMI provision would be of no further force and effect after three years from the initial date of the Operating Agreement.

---

of the 31 articles are listed at the margins, as might be paragraphs. Rather, they are set out in all caps in the middle of the page, with no accompanying "outline" words of identification, *i.e.*, no "Title," no "Section," no "Article," and —— most notably —— no "Paragraph." Moreover, every time that one of the 31 articles is referred to within the body of some other article of the Operating Agreement, it is identified as a "Section," followed by its numeric identifier, further eschewing the propriety of referring to them as "paragraphs." Specifically, article 10 and article 11 both refer to "Section 12"; article 12 refers to "Section 7", "Section 25" and "Section7" [note also that the penultimate grammatical paragraph of article 12 refers to itself as "This Section 12," in contrast to typed-in article 31 which refers to itself as "Paragraph 31" and refers to its AMI subsection as "subparagraph 31.F"; article 16 refers to "Section 12"; and article 17 refers to "Section 23".

No. 10-20497

Thus, at the completion of the first step of the test for ambiguity, we have two proffered interpretations. Both are facially plausible from the standpoint of grammar, syntax, word usage, punctuation, etc., when read in a vacuum or in isolation. We must therefore proceed to the second step of that test to see if both proffered interpretations are substantively reasonable when read in the context of the commercial "oil patch" transaction entered into by the parties. When we do that, we conclude that only one proffered interpretation objectively conveys the reasonable intent of the parties in the context of the whole transaction.

As noted at the outset, the 1971 Farmout Agreement and its attached and incorporated exhibits embody a mineral transaction in which two lessee-companies that owned oil and gas leases covering almost a quarter million acres in Montana contributed their leases to form a joint venture with a third company, a drilling and exploration company. That third company undertook to drill and develop those leases. The document and its attached and incorporated exhibits show that the initial phase of that venture contemplated the drilling of twenty wells on portions of the various leased premises during their primary terms (likely *three years* for each lease) and, if successful, the completion of such wells as producers, thereby extending the leases into their secondary terms by production, *i.e.*, for their commercially productive lives. The initial phase of the program contemplated the drilling of 20 wells to the specified depth of approximately 2,500 feet, over the course of approximately *three years*.

The several documents that together make up the joint venture contract identify, by both legal descriptions and a map, hundreds of sections within some ten townships where the premises of the contributed leases are located. Importantly, the total geographical area delineated on the AMI map — "Exhibit 'E'" to the Farmout Agreement — includes, but is more extensive than, the total acreage covered by all of the contributed oil and gas leases. And, finally, the "F" portion of the Operating Agreement's typed-in article 31 describes the legal effects

and the duration of the transaction's AMI provision, which, like the primary terms of the leases and the time contemplated for the drilling of the initial twenty exploratory wells, is *three years*.

In combination, the first four paragraphs of 31.F — its substantive provisions — present two sides of the same AMI coin.  Together, the first three paragraphs address possible acquisitions of new leases on previously unleased lands within the ten AMI townships.  The flip side of the AMI coin is the fourth and final *substantive* sub-subparagraph of subparagraph F of paragraph of 31.  This single-sentence fourth grammatical paragraph addresses the surrender or release of the entire surface acreage of any single township from the operation of the AMI when and if all of the venture's leases covering portions of that township — whether originally contributed or subsequently acquired leases — are "surrendered," *i.e.*, cease to be retained, either by the entire venture or, alternatively, by one of the parties to it.  Therefore, when 31.F is read in the context of the JOA as a whole, it becomes apparent that the surrender and acquisition provisions are meant to balance the benefits and risks to each party of (1) acquiring new leases and (2) maintaining its interest in such leases by paying its proportionate rentals.

Albeit facially sensible when read in a vacuum, Ballard's proffered interpretation leads to a result that is unreasonable, if not completely absurd, when read in the context of the entire contract.  It simply makes little if any sense for such a contract to contain an AMI provision under which the acquisition rules remain in full force and effect *ad infinitum*, but the surrender rules terminate *ipso facto* after a relatively short time — here, three years.  The unreasonableness of such an interpretation is illustrated by the following hypothetical example: During the first three years of the venture, one (or a few) of the venture's ten townships are released from the operation of the AMI by virtue of the surrender or non-maintenance of all leases covering land in such township or townships.  After

the passage of three years, however, all lands within the AMI's remaining, *un*released townships would forever thereafter continue to be (1) subject to the AMI's acquisition rules, but (2) *not* subject to the AMI's surrender rules, with which those acquisition provisions are otherwise inextricably intertwined.  This would lead to the absurd — or, at least, anomalous — situation of one party to the venture being able to (1) lie behind the log at all times after the expiration of three years; (2) forfeit, by surrender or non-maintenance, its interests in leases in all theretofore non-surrendered townships; but (3) forever thereafter be entitled to claim a share of leasehold interests subsequently acquired by another party in any or all non-surrendered townships.  Indeed, this is precisely what Ballard has attempted to do by bringing the instant action.

Simply stated, without the effect of the surrender provision, little if any incentive would remain after the first three years, for a party to pay its proportionate share of lease bonuses or rentals in any given township.  Under Ballard's interpretation, then, a party could, *after the passage of the initial three years of the venture*, surrender or fail to maintain its interest in the leases within any given township, yet that part of the AMI would nevertheless remain subject to such surrendering party's rights to claim participation rights in newly leased acreage in that very same township for the entire life of the venture — now 40 years and presumably still going.  Thus, following the passage of three years, one party to the venture could, with impunity, fail to pay its proportionate share of bonuses and rentals on leases within a given township but remain entitled to cherry-pick its participation in future leases after the fact.  This is because, *after* the passage of three years, such behavior would no longer terminate that party's future entitlement to participate in any and all new leases on any and all lands located in any and all townships within the AMI that had not been surrendered and released from the AMI during the first three years of the venture.

This amply demonstrates to our satisfaction that, as a functional matter, the intent of the parties was to have the acquisition provisions *and* the surrender provision of the JOA's AMI section remain temporally inseparable and coextensive. In other words, the continued existence of one does not make sense without the continued existence of the other; neither does the termination of one make sense without the termination of the other.[28]    We decline to credit Ballard's interpretation of the last sentence of 31.F as reasonable.

We do, however, credit Devon's proffered interpretation as reasonable. It presents a logical application of the JOA's AMI provisions by ensuring that the acquisition and surrender provisions coexist and that they terminate simultaneously. It follows that, because only Devon's interpretation is reasonable and Ballard's is not, only one reasonable reading of the final sentence of 31.F has been posited; *ergo* the language in 31.F is not ambiguous. We therefore credit Devon's interpretation and hold that the final sentence in 31.F applies to the entirety of 31.F.[29] Accordingly, because the entire AMI provision — including both its acquisition provisions and its surrender provision — expired before the claims asserted by Ballard arose, Devon has not breached its contract with Ballard, and the district court's summary judgment was proper.

## III.

## Conclusion

The district court's take-nothing summary judgment rejecting Ballard's claims, and that court's denial of Ballard's motion to amend, are, in all respects AFFIRMED, with all costs assessed against Ballard.

---

[28]  We acknowledge that there could be a situation in some other such joint ventures when the surrender provision of an AMI clause could continue after the acquisition provision expires, but that is just the opposite of the interpretation advanced here by Ballard.

[29]  Because we conclude that the contract is unambiguous and affirm the district court's summary judgment, we do not reach Devon's alternative argument that Ballard's claim is barred by laches.