# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2013

No. 13-30049
Summary Calendar

Lyle W. Cayce
Clerk

CIMAREX ENERGY COMPANY,

Plaintiff - Appellee

v.

HAROLD P. CHASTANT, JR., Individually and as Trustee, on behalf of Harold
P. Chastant, Jr. Trust,

Defendant - Appellant

--------------------------------------------------------------------------------
HAROLD P. CHASTANT, JR., Individually and as Trustee, on behalf of Harold
P. Chastant, Jr. Trust,

Plaintiff - Appellant

v.

CIMAREX ENERGY COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:11-CV-1713
USDC No. 6:11-CV-2146

Before HIGGINBOTHAM, OWEN, and SOUTHWICK, Circuit Judges.

No. 13-30049

PER CURIAM:[*]

This appeal concerns a dispute between the lessor and lessee of an oil, gas, and mineral lease on Louisiana lands.  Harold P. Chastant, Jr., the lessor, argues that Cimarex Energy Company, as lessee, owes additional royalty under the lease as a result of financial transactions that allowed it to hedge its risk against fluctuations in prices on production.  The district court granted summary judgment in favor of Cimarex.  We AFFIRM.

FACTS

On October 15, 2002, Chastant, individually and as trustee of the Harold P. Chastant, Jr. Trust, executed an oil, gas, and mineral lease in favor of Cash River Exploration, Inc.  The lease was later assigned to Cimarex.  The lease provided that Chastant would be paid a royalty of 1/8 of the value of the production of oil, gas, and other minerals from the leased property, which is calculated according to language in the lease quoted below.  Cimarex engages in hedge transactions on a portion of its oil and gas production.  For that portion, at times the price received for the minerals has been higher than that on which the royalty to Chastant is calculated, and apparently on some occasions the price has been lower.  The royalty paid Chastant has never been adjusted based on a different price realized through hedging.

Cimarex's brief explains the relevant transactions this way:

> Cimarex engaged in commodities futures trading of various types as a way of hedging against the price fluctuations in oil and gas.  Hedging is generally defined as "[a] risk management strategy used in limiting or offsetting probability or loss from fluctuations in

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the prices of commodities, currencies, or securities." Specifically, to "hedge" against price risk, one enters the futures market and buys a futures contract under which he obtains a contract position that minimizes risk against price fluctuations.

The most important point about this hedging, as it relates to this lawsuit, is that it was a purely financial activity. Generally, parties engaged in financial hedging are not actually buying or selling natural gas or crude oil. Instead, they are simply buying or selling financial positions called "derivatives," *i.e.*, "a financial instrument whose value derives from the value of an underlying asset, reference rate, or index."[1]

Chastant made written demand on Cimarex that it pay royalties based on the prices it received through entering these transactions. In a filing with the Securities and Exchange Commission that appears in the record, Cimarex reported that it had "executed cash flow effective hedges covering approximately 24% of [its] overall 2007 gas production and 11% of [its] 2008 gas volumes. . . ." During a six month period in 2009, Cimarex executed derivative contracts that "cover approximately 40% of our anticipated 2010 oil and gas production volumes."

Cimarex filed a declaratory judgment action in September 2011, in the United States District Court for the Western District of Louisiana. It sought a judicial declaration that the hedge price Cimarex received was not part of the market value on which royalty paid to Chastant was calculated under the terms of the lease. In response, Chastant filed suit in state court to recover a royalty based on what Cimarex received from its hedging operations. The state suit was removed to district court on December 13, 2011. Upon consolidation of

---

[1] These explanations from the Cimarex brief cite various secondary authorities, but we have omitted the sources.

No. 13-30049

Chastant's suit and Cimarex's motion for declaratory judgment, both parties filed cross motions for summary judgment; Cimarex's motion was granted, and Chastant's was denied. Chastant appeals from the court's final judgment, filed December 20, 2012, dismissing the matter with prejudice.

## DISCUSSION

A district court's grant of summary judgment is reviewed *de novo. E.g.*, *Ballard v. Devon Energy Prod. Co. , L.P.*, 678 F.3d 360, 365 (5th Cir. 2012). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is proper when, after considering all facts and evidence in the light most favorable to the non-movant, a reasonable jury could not find for the non-movant. *Ballard*, 678 F.3d at 365. The district court's interpretation of the parties' mineral lease is reviewed *de novo. E.g.*, *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1206 (5th Cir. 1993).

At issue is whether the lease between Cimarex and Chastant obligates Cimarex to pay royalties on amounts it generated through separate financial transactions in addition to the royalties it pays already on the market value of the oil or gas produced from the property subject to the lease. The district court properly applied Louisiana law to make this determination. Under Louisiana's mineral code, "[a] mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals." LA. REV. STAT. § 31:114. The mineral code defines "royalty" under oil and gas leases as

> any interest in production, or its value, from or attributable to land
> subject to a mineral lease, that is deliverable or payable to the lessor
> or others entitled to share therein. Such interests in production or

4

its value are "royalty," whether created by the lease or by separate instrument, if they comprise a part of the negotiated agreement resulting in execution of the lease.

LA. REV. STAT. § 31:213(5).

The parties' contractual agreement as to what constitutes royalties is derived from the language of the mineral lease itself, as "the lease contract is the law between the parties, defining their respective legal rights and obligations." *Frey v. Amoco Prod. Co.*, 603 So. 2d 166, 172 (La. 1992); *see also* LA. CIV. CODE art. 1983 (stating contracts have effect of law for parties). With respect to crude oil, the royalty provision of the lease between Chastant and Cimarex provides: "(a) On oil . . . one-eighth (1/8) of that produced and saved from the land . . . . Lessee may sell Lessor's such oil at the best market price obtainable and pay Lessor the price received f.o.b. ["free on board"] the leased property, less any severance of production tax imposed thereon." As to natural gas, the lease provides:

> (b) On gas produced from or attributable to said land and sold . . . one-eighth (1/8) of the market value at the mouth of the well of the gas so sold . . . . The price to be used in computing the market value at the mouth of the well shall be the price received by Lessee under an arms' length gas sales contract prudently negotiated in the light of the facts and circumstances existing at the time of consummation of such contract . . . .

Chastant first relies on the Louisiana statute requiring the lessee in a mineral lease "to develop and operate the property leased . . . for the mutual benefit of himself and his lessor." LA. REV. STAT. § 31:122. Chastant then argues that the lease provides for a fractional royalty with "no clear provision against a fractional division of gross revenues," meaning in effect that some royalty would be paid as a fraction of one value and the other receive the benefit

No. 13-30049

of the derivative trading.  Chastant's argument is simple: Cimarex owes royalty on the total amounts it received related to production from this well.

The central difficulty for Chastant's argument is that Cimarex's hedging operations do not affect the market value of those items at the well or on the lease.  That is a critical fact because the lease provides that royalties are to be paid on the best market price of the gas at the mouth of the well or the oil on the leased property.  Consequently, the gains or losses on derivative trading, which do not affect the price at the wellhead or on the lease, are not subject to the lease's royalty provision.

This conclusion is supported in general terms by long-standing Louisiana law.  For example, the lease in one case provided that the lessee "should pay one-eighth of the 'value of such gas' calculated at the 'market price,' which means the market price at the well or in the field and not the price which it would bring in a distant market." *Wall v. United Gas Pub. Serv. Co.*, 152 So. 561, 564 (La. 1934).  The Louisiana Supreme Court held "that the right of the owner of a royalty interest is restricted to a share in production if and when it is obtained." *Union Oil Co. of Cal. v. Touchet*, 86 So. 2d 50, 53 (La. 1956).  In a similar context, the Louisiana Court of Appeals concluded post-production costs were deductible from royalty payments because royalty payment was determined "at the mouth of the well." *Merritt v. Sw. Elec. Power Co.*, 499 So. 2d 210, 214-15 (La. Ct. App. 1986).  It relied on our holding that "Louisiana law arrives at the value of the gas at the moment it seeks to escape from the wellhead." *Freeland v. Sun Oil Co.*, 277 F.2d 159 (5th Cir. 1960).

We apply these legal concepts to the relevant contractual language.  The lease provides that the market value, 1/8 of which is then owed Chastant, is to

6

be computed "at the mouth of the well" or "f.o.b. [free on board] the leased property." The provision for gas is quite specific: "The price to be used in computing the market value at the mouth of the well shall be the price received by Lessee under an arms' length gas sales contract prudently negotiated in the light of the facts and circumstances existing at the time of consummation of such contract . . . ." There is no room in such a computation for factoring in financial transactions entered into with the intent, but perhaps not always the effect, of softening the effect of drops in those market prices. The value of oil is more simply put, but we see no distinction relevant here: "the best market price obtainable and pay Lessor the price received f.o.b. the leased property, less any severance of production tax imposed thereon."

The hedging activities are used to minimize the risk of market fluctuations in the price of the oil or gas. Because the transactions are purely financial and do not affect the market value of the oil or gas at the well or on the leased property, the profits or losses resulting from these transactions are not subject to the royalty provisions in the lease.

Chastant seeks to override such authority by arguing that a more recent Louisiana case supports that the hedging transactions are part of the market value subject to the lease's royalty provision. *See Frey*, 603 So. 2d 166 (La. 1992). In that case, royalties were due as a result of the lessee's sale of gas to a third party under a take-or-pay provision. *Id.* at 169-79. A take-or-pay provision in a contract requires a "purchaser to take, or failing to take, to pay for the minimum annual contract volume of gas which the producer-seller has available for delivery." 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 1038 (2012). The district court correctly explained that this decision is

No. 13-30049

inapplicable, stating that "the *Frey* court specifically held that the take-or-pay payments were part of the 'amount realized' under the terms of the lease at issue, and reaffirmed the well-settled principle that 'the right of the owner of a royalty interest is restricted to a share in production if and when it is obtained.'" *Frey* provides no legal basis for Chastant's position. Take-or-pay is, for these purposes, an alternative to actual production, or effectively a minimum production for purposes of rights under the lease. Hedging transactions do not serve that purpose. They are supplements to production, not substitutes.

The mineral lease is clear as to how royalties are to be paid. Royalties on oil are to be paid on "the best market price obtainable" for the price received "f.o.b. the leased property," while royalties on gas are to be paid on "the market price at the mouth of the well." That clarity stops a court from interpreting the agreement beyond its plain language. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046.

In summary, the mineral lease between Cimarex and Chastant does not require Cimarex to pay royalties on amounts generated through its separate financial activities. What is owed is calculated on the market value at the mouth of the well or leased property.

AFFIRMED.