# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 9, 2013

No. 12-30494

Lyle W. Cayce
Clerk

JEFF SIMMONS; ALICE SIMMONS; JEANNE SIMMONS; GERALD EDWARD MCBRIDE; EDWARD BRYANT BONNER; ET AL,

Plaintiffs-Appellants,

v.

SABINE RIVER AUTHORITY STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT; LINDA CURTIS SPARKS; ENTERGY GULF STATES LOUISIANA L.L.C.; ENTERGY CORPORATION; ENTERGY SERVICES INCORPORATED; ENTERGY LOUISIANA, L.L.C.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Louisiana

Before STEWART, Chief Judge, and SMITH and WIENER, Circuit Judges.

CARL E. STEWART, Chief Judge:

This case asks us to resolve whether the Federal Power Act preempts property damage claims under state law where the claim alleges negligence for failing to act in a manner FERC expressly declined to mandate while operating a FERC-licensed project. We hold that it does, and so we AFFIRM the district court's dismissal of Plaintiffs' case with prejudice.

No. 12-30494

## I. BACKGROUND

### A.    Facts

The Sabine River meanders between Texas and Louisiana.  Two state agencies jointly regulate the Sabine River's waterways: the Sabine River Authority of Louisiana and the Sabine River Authority of Texas (collectively, "Authorities").  Upon application by the Authorities, the Federal Power Commission[1] granted a fifty-year license (the "License"), commencing October 1, 1963, to the Authorities for the "construction, operation and maintenance" of Project Number 2305 (the "Project").  The Project included the construction of a dam (the "Toledo Bend Dam" or the "Dam"), a large reservoir, a spillway, and a hydroelectric plant.  The Dam spans the Texas/Louisiana state line and is located in the southern part of the reservoir.

Under a Power Sales Agreement (the "Agreement"), the Authorities granted Defendant-Appellant Entergy[2] the right to oversee the generation of power and to purchase the generated power.  Under the terms of the Agreement, Entergy is subject to the terms and conditions of the License.  The License requires the Authorities to maintain a normal maximum reservoir elevation of 172 feet mean sea level ("msl").  To generate power, a minimum reservoir elevation of 162.2 feet msl is required.  To maintain the required reservoir levels, water is released through the spillway gates, the power turbines, or both.  Entergy and the Authorities operate the spillway gates, which are located in Louisiana.

---

[1] In 1977, the Federal Power Commission was reorganized and renamed the Federal Energy Regulatory Commission ("FERC").  References to FERC herein encompass both the Federal Power Commission and FERC.

[2] The Agreement was entered into with Entergy's predecessors, but we refer simply to "Entergy" for ease of understanding.  For purposes of this appeal, Entergy includes all of the named Entergy defendants.

No. 12-30494

Between 2000 and 2003, pursuant to Article 43 of the License, FERC considered several requests to modify the Project's operations.[3] FERC conducted an analysis of historical floods and found that the Dam had not had "any significant effect" on flooding. FERC ultimately denied most of the requests, including a request to raise the Project's minimum reservoir elevation, and issued a report explaining its reasoning. In declining to order changes to project operations during floods, FERC observed that the Project "cannot provide any significant flood control benefits." However, FERC did require improvements to the Project's Emergency Action Plan.

## B.     Procedural History

Plaintiffs-Appellants ("Plaintiffs") are 28 individuals who allege that their properties were flooded and eroded after the Authorities and Entergy opened the spillway gates from October 30, 2009 through November 2009.[4]

In October 2010, Plaintiffs filed suit in Louisiana state court, alleging negligence, nuisance, trespass, unconstitutional taking, damage of property without just compensation, and due process violations under the Louisiana and United States constitutions. Plaintiffs sought, *inter alia*, damages and a permanent injunction "enjoining [Defendants] from opening the flood gates of the Toledo Bend Dam in such a manner as will cause the inundation of the downstream properties of the Plaintiffs."

Defendants thereafter removed the action under 16 U.S.C. § 825p, which provides federal courts with jurisdiction over duties and liabilities created by the Federal Power Act ("FPA"), and under 28 U.S.C. § 1331. Plaintiffs subsequently

---

[3] Article 43 states, "The Licensees shall install additional capacity or make other changes in the project as directed by the Commission, to the extent that it is economically sound and in the public interest to do so, after notice and opportunity for hearing."

[4] Plaintiffs have not specified the precise date in November 2009 on which the gates were closed.

filed a motion to remand, arguing, *inter alia*, that their complaint did not present a federal question. While Plaintiffs' motion to remand was pending, Defendants filed a motion to dismiss the suit under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7). Plaintiffs then filed an opposed motion for leave to amend their complaint; the motion sought to delete references to the United States Constitution. Plaintiffs' amendments, if granted, would have left only state causes of action, but would have left undisturbed their request for a permanent injunction. Six months later, without any action having been taken on any of the pending motions, Plaintiffs filed an opposed motion for leave to amend their complaint a second time. This amendment sought to remove Plaintiffs' requests for injunctive relief.

Subsequently, without ruling on any of Plaintiffs' pending motions, the district court held a hearing on the pending motion to dismiss. The district court then granted Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), finding that Plaintiffs' state law-based property damage claims were preempted by the FPA and the License, and entered judgment dismissing Plaintiffs' case with prejudice. This appeal followed.[5]

## II.  STATE TORT CLAIMS

Plaintiffs argue that the district court improperly dismissed Plaintiffs' claims based on preemption.

### A.    Standard of Review

We review the district court's grant of a motion to dismiss de novo. *Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012) (citation omitted). Well-pleaded facts are viewed in the light most favorable to the plaintiff. *Castro v.*

---

[5] Plaintiffs have abandoned any challenge to the district court's holding that the FPA preempts their injunctive relief claim by failing to brief any argument and by continuing to press their attempt to amend their complaint to excise this claim. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003) (citation omitted).

No. 12-30494

*Collecto, Inc.*, 634 F.3d 779, 783 (5th Cir. 2011) (citation and internal quotation marks omitted).

## B.    Preemption

"Federal preemption is an affirmative defense that a defendant must plead and prove." *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012) (citations omitted). Defendants did so plead. If the complaint establishes the applicability of a federal preemption defense, it can properly be the subject of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Id.* (citation omitted).

As is well known, federal preemption is based on the Supremacy Clause, which provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.    There are three types of preemption: (1) express preemption,[6] (2) field preemption, and (3) conflict preemption. *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1265-66 (2012). Field preemption occurs when

> [t]he intent to displace state law altogether can be inferred from a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

*Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (citation and internal quotation marks omitted). Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations and internal quotation marks omitted).

---

[6] Express preemption is not implicated here, so we do not discuss it further.

5

The district court was not explicit as to which type of preemption it found applicable. However, we may affirm the district court's judgment for any reason supported by the record. *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009) (citation omitted).

## C.    Federal Power Act

In order to understand whether the FPA preempts state property damage claims, we look to the text of the Act, its history, and the way in which the Supreme Court, our circuit, and our sister circuits have interpreted it. We note that this is a question of first impression in this circuit. Our analysis leads us to conclude that the FPA preempts property damage claims based in state tort law where the alleged damage is the result of "negligently" operating in compliance with a FERC-issued license.

The Federal Power Act of 1935 indicates congressional intent for "a broad federal role in the development and licensing of hydroelectric power." *California v. FERC*, 495 U.S. 490, 496 (1990). There are several FPA sections relevant to the claims at issue here. First, Section 4(e) of the Act authorizes FERC to issue licenses for projects "necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams . . . over which Congress has jurisdiction." 16 U.S.C. § 797(e). Second, Section 10(a)(1) of the Act requires FERC to issue licenses that the Commission determines are "best adapted" for power development and other public uses of the waters, including flood control. 16 U.S.C. § 803(a).

Third, Section 10(c) of the Act is central to Plaintiffs' arguments and our analysis. First, it requires the licensee to maintain the project and conform to Commission rules. 16 U.S.C. § 803(c). Importantly, it also states that "[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of

the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor." *Id.*

Finally, Section 27 of the Act is a savings clause:

> Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821.

The Act "careful[ly] preserv[ed] separate interests of the states throughout the Act, without setting up a divided authority over any one subject." *First Iowa v. Hydro-Elec. Coop. v. Fed. Power Comm'n*, 328 U.S. 152, 174 (1946) (footnote omitted). As several cases recount, members of Congress who were involved in formulating the FPA emphasized that the state retained some water rights. For example, Representative William L. LaFollette of Washington stated, "The property rights are within the State. It can dispose of the beds, or parts of them, regardless of the riparian ownership of the banks, if it desires to[.]" *Id.* (citing 56 Cong. Rec. 9810) (other citation omitted); *see also Skokomish Indian Tribe v. United States*, 410 F.3d 506, 519 (9th Cir. 2005) (citations omitted) (holding that the FPA "does not create a federal private right of action, but instead preserves only existing state-law claims against licensees"); *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 78 (2d Cir. 1992) (citation omitted) (concluding that "[t]he floor debate on the FPA . . . indicates that property damage caused by licensees was to be determined by reference to state law").

## D.    Supreme Court Precedent and Other Persuasive Authority

The district court relied on *First Iowa* and *California v. FERC* for its preemption determination. Both cases concern state water permitting schemes rather than state tort law, as is at issue here; thus while neither is directly on

No. 12-30494

point, we find them both informative, as is *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239 (1954).

In *First Iowa*, the Supreme Court considered whether a proposed federal hydroelectric project was required to obtain a state permit, as mandated by Iowa law, in addition to its federal license.  328 U.S. at 161.  The Court held that such a state permit was not required because it would allow the state agency a "veto power over the federal project" and thereby subvert the comprehensive control of the project granted to the federal government.  *Id.* at 164.  The Court also held that the savings clause, 16 U.S.C. § 821, was "limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature" and therefore focused on state property rights.  *Id.* at 175-76.  Accordingly, the Court held that the state regulation was not among the category of rights reserved to the states in the FPA's savings clause and that the FPA preempted the state permit requirement at issue.  *Id.* at 175-76, 182.

In *Niagara Mohawk*, the Supreme Court held that the Federal Water Power Act of 1920[7] did not eliminate preexisting water rights, grounded in state law, on navigable streams.  347 U.S. at 248.  In so holding, the Court recognized the United States's "dominant servitude . . . under which private persons hold physical properties obstructing navigable waters of the United States and all rights to use the waters of those streams," but it also recognized "that the exercise of that servitude, without making allowances for preexisting rights under state law, requires clear authorization."  *Id.* at 249 (internal footnote omitted).  Moreover, the Court concluded that while the Act reserves the ability to "exercise . . . the federal servitude and . . . federal rights of purchase or condemnation, there is no purpose expressed to seize, abolish or eliminate water rights without compensation merely by force of the Act itself."  *Id.* at 251-52

---

[7] The Federal Water Power Act, as amended, is now part of the Federal Power Act.  *See Niagara Mohawk*, 347 U.S. at 241 n.1 (citations omitted).

(footnote omitted). Importantly for the issue here, the Court noted that the Act "merely imposes" on the owners of state-based property rights "the additional obligation of using them in compliance" with the Act. *Id.* at 252. The Court expressed disbelief that the Act abolished "preexisting water rights on a nationwide scale*,*" stating that such action would require "a convincing explanation of that purpose," which the Court did not find. *Id.* at 252-53.

If that were the end of our inquiry, the issue before us would present a closer question. However, *California v. FERC*, decided over four decades after *First Iowa*, indicated that the FPA has occupied the field of "power development and other public uses of the waters," with the exception of a narrow carve-out for water use rights. *California v. FERC*, 495 U.S. at 494, 506 (citing 16 U.S.C. § 803(a)). In *California v. FERC*, the Supreme Court considered whether FERC had the exclusive authority to set minimum stream flow rates, thereby preempting California's regulation of the same. *Id.* at 493. Relying on *First Iowa*, the Court concluded that California's regulations were preempted because Section 27 of the FPA, 16 U.S.C. § 821, was a limited savings clause, exempting only requirements that "reflect [or] establish 'proprietary rights' or 'rights of the same nature as those relating to the use of water in irrigation or for municipal purposes.'" 495 U.S. at 498 (quoting *First Iowa*, 328 U.S. at 176) (other citations omitted).

The language in *California v. FERC* indicates that the Supreme Court has interpreted the FPA as occupying the field of public water use and power generation except for water use rights. Thus, we agree with the Ninth Circuit's statement that *First Iowa* and its progeny have "read the broadest possible negative pregnant into [the FPA's] savings clause," exempting only "a state property law regime [that] enables users of streams and wells to obtain proprietary rights in a continuing quantity of water." *Sayles Hydro Assocs. v.*

*Maughan*, 985 F.2d 451, 454-55 (9th Cir. 1993) (also discussing *California v. FERC*'s interpretation of *First Iowa*).

The importance of a single federal agency controlling public water use and dam operations is underscored by the factual scenario presented by the instant case. The Dam spans the Texas and Louisiana state lines, and the FERC license was granted to an entity comprised of both state agencies. Yet, Plaintiffs assert claims only under *Louisiana* law and only against *Louisiana* state agencies, in addition to the private defendants. That each state may have different causes of action and different standards of conduct that it could impose on the FERC licensee is problematic when states are jointly involved in such a project.

## E.     Property Damage Claims Under FPA § 10(c)

*California v. FERC*'s interpretation of Section 27's general savings clause is instructive for our interpretation of Section 10(c)'s limited savings clause. The latter cannot be interpreted so broadly as to allow state tort law to supplant FERC's exclusive control of dam operations.[8]

Because the state law property damage claims at issue here infringe on FERC's operational control, we hold that they are conflict preempted. Essentially, Plaintiffs allege that Defendants were negligent because they failed to act in a manner FERC had expressly declined to require. But FERC, not state tort law, must set the appropriate duty of care for dam operators. *See* 16 U.S.C.

---

[8] Although neither party cites it, this circuit previously considered whether licensees were exempt from property damage claims when operating projects pursuant to a FERC-issued license. *Seaboard Air Line R.R. v. Cnty. of Crisp, Ga.*, 280 F.2d 873 (5th Cir. 1960). There, we held that a railroad was able to seek damages from the operator of a FERC-licensed dam, noting that in the FPA, "Congress contemplated damage inflicted after as well as at the time of construction." *Id.* at 876-77. *Seaboard* presented a minority view that the FPA itself creates a cause of action for damages. As the case before us concerns claims for damages under state law, and Plaintiffs have not argued an FPA-created cause of action, *Seaboard* does not bear on the question before us. Furthermore, *Seaboard* is doubtful authority as it predated the Court's four-factor test for "determining whether a private remedy is implicit in a statute not expressly providing one," *Cort v. Ash*, 422 U.S. 66, 78 (1975).

§ 803(c) ("[T]he licensee . . . shall conform to such rules and regulations as the Commission may from time to time prescribe.").

The Supreme Court has recognized that damages claims can serve the same effect as regulations. *See Kurns*, 132 S. Ct. at 1269 ("[S]tate regulation can be . . . effectively exerted through an award of damages, and [t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." (second alteration in original) (citation and internal quotation marks omitted)). Plaintiffs attempted, through the proper administrative procedure channels, to impose changes on Dam operations. FERC considered these requests and issued a report denying most of the requested changes. Plaintiffs have not asserted that this administrative decision was improper. Nonetheless, failing to achieve their objective, Plaintiffs now seek to use state law to accomplish the same aims, alleging that Defendants were negligent for not changing their operations. Permitting such state property damage claims in an attempt to force changes to a FERC-issued license would "constitute a veto of the project that was approved and licensed by FERC." *California v. FERC*, 495 U.S. at 507 (citations and internal quotation marks omitted); *see also City of Lowell v. ENEL N. Am., Inc.*, 796 F. Supp. 2d 225, 231 (D. Mass. 2011) (citation omitted) (holding that a "negligence claim is preempted by the FERC license because [the plaintiff] cannot use state tort law to prevent [the FERC licensee] from doing something that FERC has sanctioned" and describing the negligence claim as a "collateral attack on the FERC license").[9]

---

[9] We do not hold that all state property damage claims are preempted by the FPA. For example, a claim alleging negligence for failure to conform to FERC's guidelines would not conflict with FERC's operational control. Nor does our holding conflict with the cases cited by Plaintiffs. The D.C. Circuit, for example, held that "Congress intended for § 10(c) merely to preserve existing state laws governing the damage liability of licensees," so FERC could not impose strict liability on dam operators. *S.C. Pub. Serv. Auth. v. FERC*, 850 F.2d 788, 795 (D.C. Cir. 1988). That does not imply that Congress intended for § 10(c) to enable state tort law to replace FERC's determination of the appropriate duty of care.

Applying state tort law to set the duty of care for the operation of FERC-licensed projects would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the FPA. *See Arizona*, 132 S. Ct. at 2501 (citations and internal quotation marks omitted). We therefore hold that the district court properly concluded that the FPA preempts Plaintiffs' claim for negligence.[10]

## III. MOTIONS TO AMEND AND REMAND

After Defendants filed their motion to dismiss, Plaintiffs filed two motions to amend their complaint. The first motion to amend sought to delete references to the United States Constitution, which Plaintiffs characterized as "mistaken" additions to their complaint. The second motion to amend sought, without explanation, to remove the complaint's claim for injunctive relief. The district court did not explicitly rule on these motions before granting Defendants' motion to dismiss. Plaintiffs argue the district court abused its discretion in failing to permit them to amend their complaint. Plaintiffs also argue that the district court erred when it implicitly denied their motion to remand.

## A.   Standard of Review

A district court's denial of leave to amend is reviewed for an abuse of discretion. *Ballard v. Devon Energy Prod. Co.*, 678 F.3d 360, 364 (5th Cir. 2012) (citation omitted). Similarly, a district court's failure to remand state law claims to the state court from which the case was removed is reviewed for abuse of discretion. *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158 (5th Cir. 2011) (citation omitted).

---

[10] As we are able to affirm the district court's judgment on preemption grounds, we need not address Defendants' argument that the doctrine of primary jurisdiction further supports the district court's ruling.

**B.    Motions to Amend**

Although the district court did not explicitly deny Plaintiffs' motions to amend, it implicitly did so when it entered its ruling in favor of Defendants' motion to dismiss and dismissed the case with prejudice. *See Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citation omitted).

"[A] party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Whether to grant leave to amend a complaint is entrusted to the sound discretion of the district court[.]" *Ballard*, 678 F.3d at 364 (citation and internal quotation marks omitted).

"Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *Id.* (citation and internal quotation marks omitted).  Where, as here, the district court has not "engage[d] in a formal recitation of reasons[, the] reason for denial must be clear . . . either from the findings of the district court or elsewhere in the record." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 367 (5th Cir. 2001) (citations omitted).

Defendants argue that Plaintiffs' proposed amendments were futile in light of the district court's holding that the FPA preempted their state law claims.  We agree.  "Clearly, if a complaint as amended is subject to dismissal, leave to amend need not be given." *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir. 1980), *abrogated on other grounds by Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 n.33 (1983) (citation omitted).  Here, the complaint as amended would have left only state law claims for property damage.  As we have determined that the district court correctly dismissed these claims, Plaintiffs' motions to amend were

futile.  Accordingly, the district court did not abuse its discretion in implicitly denying Plaintiffs' motions to amend.

## C.    Motion to Remand

Because we have concluded that the district court properly granted Defendants' motion to dismiss, we need not consider whether the district court abused its discretion in denying Plaintiffs' motion to remand.

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.