Judgment rendered December 20, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,301-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

RIVES PLANTATION, L.L.C.                    Plaintiff-Appellant

versus

BPX PROPERTIES (N.A.) LP              Defendant-Appellee

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 591,555

Honorable Ramon Lafitte, Judge

* * * * *

DAVIDSON, SUMMERS, HEARNE,              Counsel for Appellant
MARTIN, AND POWELL, LLC
By: Grant Ernest Summers
    James Davis Powell
    Andrew D. Martin

SALLY DUNLAP FLEMING, PLC
By: Sally Dunlap Fleming
    Owen Michael Courreges

STAG LIUZZA, LLC
By: Michael Gregory Stag
    Ashley Melerine Liuzza
    Matthew Douglas Rougenes

LISKOW & LEWIS, APLC                    Counsel for Appellee
By: Paul M. Adkins
    April L. Rolen-Ogden
    Brittan Jackson Bush
    Michael H. Ishee
    Gus E. Laggner


* * * * *


Before ROBINSON, HUNTER, and ELLENDER, JJ.

**ROBINSON, J.**

In this multifaceted appeal involving significant postproduction costs charged against a mineral royalty, Rives Plantation ("Rives") appeals a final judgment of dismissal encompassing four partial summary judgments, the granting of a motion to strike exhibits attached to an opposition to one of the motions for partial summary judgment, and the denial of a motion to vacate that partial summary judgment.

For the foregoing reasons, we affirm the final judgment in part, reverse the final judgment in part, reverse the judgment granting the Kinderhawk motion for partial summary judgment, and remand for further proceedings.

## BACKGROUND AND PROCEDURAL HISTORY

On April 15, 2008, Rives granted a mineral lease on land it owned in Bossier Parish and Caddo Parish to Delta Lands Exploration, Inc.

Unless a mineral lease states otherwise, postproduction costs are borne on a *pro rata* basis between operating and non-operating interests. *See Culpepper v. EOG Resources, Inc.*, 47,154 (La. App. 2 Cir. 5/16/12), 92 So. 3d 1141, *writ denied*, 12-1509 (La. 10/12/12), 98 So. 3d 870. The lease in this matter states otherwise, as it contains the following clause ("Paragraph 28"):

> The royalty interest of Lessor provided for in this lease shall not be charged, and shall not bear, any costs whatsoever in connection with the production, compression, gathering and transportation costs, except charges incurred by Lessee from unaffiliated Third Parties in which Lessee does not have a beneficial interest.

On May 27, 2008, Delta assigned its interest in the lease to Petrohawk Properties, LP ("Petrohawk Properties"), which is a subsidiary of Petrohawk Energy Corporation ("Petrohawk Energy").

*Names of entities*

In July of 2011, Petrohawk Energy and Petrohawk Properties were acquired by BHP Billiton Petroleum (North America), Inc. Effective May 17, 2013, Petrohawk Properties' name was changed to BHP Billiton Petroleum Properties (N.A.), LP ("BHP").

In October of 2018, BP America Production Company acquired Petrohawk Energy and BHP. Petrohawk Energy's name was changed to BPX Production Company, and BHP's name was changed to BPX Properties (N.A.), LP ("BPX").

*Gas gathering system*

BPX drilled six wells under the terms of the lease. The first well was permitted in 2009. The BPX wells were connected to a gas gathering system which was owned and operated by Hawk Field Services, LLC ("Hawk Field"), which was a wholly-owned subsidiary of BPX's parent, Petrohawk Energy.

In addition, Chesapeake Operating drilled and became the operator of seven wells on lands included within the same drilling and production unit as part of Rives' lease. Thus, BPX owns a non-operating leasehold interest in the Chesapeake wells.

On April 12, 2010, Hawk Field entered into a "Formation and Contribution Agreement" with KM Gathering, LLC ("KMG"), a wholly-owned subsidiary of Kinder Morgan. As part of the agreement, Hawk Field

contributed the gathering system it owned in North Louisiana to Kinderhawk Field Services, LLC ("Kinderhawk") in exchange for a 50% membership interest in Kinderhawk. The remaining 50% interest was owned by KMG. KMG paid $917 million to Petrohawk.

As part of the 2010 formation agreement, a gas gathering agreement effective May 21, 2010, was entered into by Kinderhawk, Petrohawk Operating Company, Petrohawk Properties (now BPX), and KCS Resources, LLC. Gas from the BPX wells was gathered and treated under the agreement in exchange for set rates for gathering, treating, and fueling production.

Rives contends that the gas gathering agreement: (1) dedicated all of BPX's gas in the Haynesville Shale area; (2) made the dedication for the life of BPX's leases instead of for a set number of years; (3) made the dedication a covenant running with the land; (4) fixed fees for gathering and treating the gas delivered, with a provision for annual rate increases; and (5) imposed minimum volume commitments obligating BPX to pay fixed minimum amounts regardless of whether gas was moved through the system. Rives accuses Petrohawk of subjecting itself to these allegedly more onerous terms in return for the $917 million distribution as well as for its Hawk Field subsidiary, which still owned half of Kinderhawk at the time, also reaping economic benefits.

Before June of 2011, BPX's sibling entity, Hawk Field, and parent corporation, Petrohawk Energy, held a 50% interest in Kinderhawk. In May 2011, that 50% interest was sold to KMG for $743 million and relief from

3

remaining capital commitments of $41.4 million. As of May 4, 2011, Kinderhawk was owned entirely by KMG.

*Petition*

In 2015, four years after the purported divestment, BPX began withholding royalties from Rives to recover what BPX considered to be deductible postproduction costs.

On May 17, 2016, Rives filed suit in Caddo Parish against BHP. Rives alleged that BHP failed to pay royalties due by applying deductions that were not incurred by the lessee from unaffiliated third parties in which the lessee did not have a beneficial interest. Rives alleged that certain costs of treating and gathering were incurred under gathering contracts that were confected by BHP and its affiliates in transactions that were not made at arm's length. Rives further alleged that certain costs on the Chesapeake-operated wells were created between Chesapeake and its affiliates under contracts that were not made at arm's length. Rives also maintained that costs were charged which did not enhance or increase the market value of the gas.

Rives stated that it sent a demand letter to BHP on September 21, 2015, for failing to pay proper royalties. BHP responded that because it had not deducted other postproduction costs which it should have deducted, it was placing Rives' royalty interest in negative pay status until those costs were recouped through prior period adjustments. Rives sent a second demand letter to BHP on January 11, 2016.

Rives sought all unpaid royalties, double damages equal to the amount due, legal interest, costs, and attorney fees.

In an amended petition, Rives alleged that costs deducted from royalty payments for gathering, treating, and compression were recouped by BHP directly or indirectly through: (1) permanently dedicating the lease to long-term contracts with affiliated gathering companies for gathering, compression, and treating services; (2) receiving distributions from such affiliated gathering companies; and (3) selling its interest in such affiliated gathering companies for a price or consideration which included the future value of the revenue derived from such services.

On August 1, 2019, BHP's name was changed to BPX Properties (N.A.), LP ("BPX"), which asked for the case caption to be amended to reflect the name change. The court granted the motion on September 18, 2019.

### *Chesapeake motion for partial summary judgment*

On February 19, 2020, BPX filed a motion for partial summary judgment on the claim regarding postproduction costs assessed against the royalties on wells operated by Chesapeake ("Chesapeake motion"). BPX argued that it was not an affiliate of or had a beneficial interest in Chesapeake or the midstream companies charging postproduction costs on the Chesapeake wells.

Chesapeake operated seven producing wells on a unit that covered part of the leasehold. Until the March 2017 production month, Chesapeake marketed the production from these wells through Chesapeake Midstream Operating, Louisiana Midstream Gas Services, and Magnolia Midstream Gas Services (collectively referred to as the "Chesapeake gas gatherers"). In March of 2017, BPX began to take production in kind from four of these

wells. BPX began marketing that production under a gas gathering agreement entered into with Louisiana Midstream Gas Services and Magnolia Midstream Gas Services (collectively referred to as the "TIK gas gatherers").

BPX argued that it had only an arm's-length third-party relationship with Chesapeake, the Chesapeake Gas Gatherers, and the TIK gas gatherers. It denied that it was affiliated with or had a beneficial interest in any of them.

Attached in support of the motion was an affidavit from Dakota Clark, an advisor for BPX. Clark testified that BPX was never under common control with Chesapeake, the Chesapeake Gas Gatherers, or the TIK gas gatherers. No parent-subsidiary or sibling-corporate relationship had ever existed between BPX and any of them.

An affidavit from John Smith, an employee of BP America Production Company, was also attached in support of the motion. Smith stated that BPX was not an affiliate with or had a beneficial interest in Chesapeake.

Rives contended in opposition to the motion that BPX was closely related to Chesapeake and had a beneficial interest in it. Charges generated in transactions between two affiliates cannot be charged to Rives even if the two affiliates are not affiliated with BPX. Rives also argued that Chesapeake's actions in marketing production through its own affiliated system should be imputed to BPX. Rives maintained that if Chesapeake is statutorily treated as the lessee to Rives because of compulsory unitization, Rives' lessee has used affiliates to market and transport gas.

Rives further contended that a beneficial interest also existed. Merriam Webster defines "beneficial" as "producing good results or helpful effects." Chesapeake maintained the lease for BPX by drilling wells. BPX also expressly consigned to Chesapeake its duty under the lease to market production. Rives argued that it would be inconsistent to permit BPX to benefit from Chesapeake's operations while simultaneously allowing BPX to disavow involvement with Chesapeake. In Rives' view, the meaning of "beneficial" clearly includes BPX's relationship with Chesapeake when it performed BPX's lease obligations and implied obligations for BPX's advantage.

BPX responded that using the definitions of "affiliate" and "beneficial interest" relied upon in *In re Goodrich Petroleum Corp.*, 600 B.R. 361 (S.D. Tex. 2019), it is clear that BPX has never been an affiliate of or had a beneficial interest in Chesapeake, the Chesapeake gas gatherers, or the TIK gas gatherers. Further, the definition of "beneficial" presented by Rives would render Paragraph 28 meaningless as a lessee receives benefits under any midstream contract. BPX argued that *Goodrich* rejected what Rives is trying to accomplish by using agency law and unitization to impute an alleged affiliation between Chesapeake and the Chesapeake gas gatherers to BPX. BPX contended that there is no support for Rives' position that Chesapeake is statutorily treated as Rives' lessee because of compulsory unitization. Unitization does not convert the operator into the lessee.

*Transportation motion for partial summary judgment*

On December 23, 2020, BPX filed a motion for partial summary judgment on the transportation claims ("transportation motion"). BPX

contended that the general rule in Louisiana is that postproduction costs are shared on a *pro rata* basis between the lessor and lessee. BPX further contended that when determining the market value for gas at the well, Louisiana law does not limit the reconstruction approach to the nearest market for gas or allow for the deduction of postproduction costs only when those costs enhanced or increased the value of the gas.

Rives argued in opposition to the motion that the reconstruction approach can only include costs which impact market value, and that some of the charges failed to do this. Rives further argued that if there is no actual market at the wellhead, the beginning point for reconstructing the value is at the nearest market because the actual market value of gas is not lessened just because the lessee elects to spend additional money bypassing the nearest market.

### *Treating motion for partial summary judgment*

On January 15, 2021, BPX filed a motion for partial summary judgment on the treating claims ("treating motion") concerning the wells it operated.

BPX argued that the general rule in Louisiana is that postproduction costs are shared proportionately in a "market value at the well" lease unless the lease provided to the contrary. Treating costs are not included among the enumerated costs in paragraph 28 for which BPX may not charge Rives unless certain conditions are met. Therefore, according to BPX, the general rule allowing deductions applies.

In support of its motion, BPX submitted excerpts from the depositions of Rives' experts, John Dean and Jeff Wellborn. BPX argued that Dean and Wellborn recognized that treating is a separate and distinct type of cost.

Rives argued in opposition to the motion that the absence of the word "treating" from paragraph 28 was not definitive. Rives contended that the lease abrogated the general rule of deducting costs *pro rata* by expressly listing the categories of postproduction costs which could not be charged against the royalty. Rives also argued that it could be reasonably inferred that the parties intended to prohibit all deductions for postproduction costs. According to Rives, the phrase "in connection with" could also be read broadly as including all costs reasonably associated with the enumerated stages of bringing gas to market. Rives contended that without the default rule, the lease was ambiguous regarding treating costs and summary judgment is inappropriate.

Rives maintained that the gas gathering agreement supports the argument that the term "gathering" was contemplated by BPX as an umbrella term including "treatment" because the agreement referred to one party as the "shipper" and the other party as the "gatherer." Finally, Rives contended that the fact that treatment rates differ is not dispositive of the issue and makes them no less intertwined with the enumerated stages of postproduction in paragraph 28.

BPX responded that interpreting the lease to apply paragraph 28 to all postproduction costs would render its language meaningless. BPX reiterated that Dean and Wellborn acknowledged that gathering and treating charges were separate charges. Finally, BPX explained that gathering

9

involved the movement or transfer of gas, while treating modified the physical composition of gas. Thus, all gas is gathered, but not all gas is treated.

### *Kinderhawk motion for partial summary judgment*

On January 15, 2021, BPX filed a motion for partial summary judgment ("Kinderhawk motion") on the gathering, treating, and fuel costs incurred on the BPX wells.

BPX argued that the gas gathering agreement was the only contract establishing a relationship between BPX and Kinderhawk. The costs were incurred in the years following the 2011 divestment. BPX relied on *Goodrich* for the definitions of "affiliated" and "beneficial interest" as those terms were not defined in the lease. *Goodrich* defined affiliate as a corporation that is related to another corporation by shareholdings or other means of control, such as a subsidiary, parent, or sibling corporation. BPX argued that the level of control required to create an affiliate relationship did not exist between BPX and Kinderhawk. BPX contended that it has only an arm's-length contractual relationship for services with them. *Goodrich* defined a beneficial interest as a right or expectancy in something, such as a trust or an estate, as opposed to legal title to that thing. BPX maintained it has no beneficial interest in Kinderhawk because it has no right or expectancy in Kinderhawk.

Among the documents submitted in support of the motion was an affidavit from Dakota Clark, an advisor for shale assets for BPX. Clark stated that following the 2011 divestment, BPX was never under common control with Kinderhawk, and BPX and Kinderhawk did not have a parent-

10

subsidiary or sibling-corporate relationship. Clark further stated that: (1) BPX has nothing but an arm's-length relationship with Kinderhawk; (2) BPX has no parent-subsidiary or sibling-corporate relationship with KMG, the 100% owner of Kinderhawk after the 2011 divestment; (3) BPX has never been under common control with KMG or Kinder Morgan; and (4) BPX has never had a right or interest in KMG.

Also attached to the motion was an affidavit from John Smith, who is employed by BP America Production Company. He stated that prior to June of 2011, no postproduction costs were deducted from Rives' royalty payments for the BPX wells.

BPX filed a supplemental memo on February 1, 2021. Attached to it were excerpts from the depositions of John Dean and Jeff Wellborn. Dean testified that it appeared that invoicing and payment of those invoices occurred on a monthly basis. Wellborn testified that the gathering, treating, and fuel fees were charged for services rendered on a monthly basis.

Rives attempted to file its opposition memo on February 16, 2021. Due to a court closure necessitated by record-breaking freezing temperatures, the opposition was not placed in the record at that time even though it was provided to opposing counsel.

Rives first argued that the costs were incurred when the gas gathering agreement was executed. Rives further argued that the costs were not incurred by BPX, as invoices showed that costs were billed to Petrohawk Operating Company or BHP Billiton (TXLA Operating) Company.

Rives next argued that BPX's affiliation and beneficial interest continued past June of 2011 as the sale was not a divestment but a disguised

11

loan. Rives noted that Petrohawk admitted to a continued involvement in Kinderhawk, and the value that Petrohawk received for its interest in the gas gathering system was based on the guarantees in the gas gathering agreement. Rives contended that the definitions of "affiliated" and "beneficial interest" given in *Goodrich* were too narrow.

Among the documents submitted in opposition to the Kinderhawk motion was a BHP Billiton internal memo dated November 28, 2011. The memo stated that the Kinderhawk sale was classified as a failed sale and accounted for as a financing arrangement for financial reporting purposes. It further stated the transaction would be presented as if a sale never occurred and instead a loan was issued for one-half of the gas gathering system's fair value or KMG's contribution of $917 million.

Excerpts from several financial statements were attached to the opposition, namely Form 10-Ks filed by Petrohawk Energy with the Securities and Exchange Commission ("SEC") for 2010 and 2011, and Petrohawk Energy's March 2014 financial report. The 2011 10-K submitted by Rives stated that the Kinderhawk joint venture was accounted for as a failed sale, and that the gathering agreement constituted extended continuing involvement. It then stated that as a result of the failed sale, Petrohawk Energy recorded a financing obligation representing the proceeds received, under the financing method of real estate accounting. Reductions to the obligation and non-cash interest on the obligation were tied to the gathering and treating services.

Also attached to the opposition was an expert report ("report") from John Dean. Dean opined that even though record ownership of the gathering

12

assets was transferred, BPX continued to own those assets from an economic and financial reporting perspective. Dean also stated that even though the form of the transaction reflected a sale of the gathering system, in substance, BPX borrowed money from Kinder Morgan. Attached to the report was a rebuttal report from Dean in which he stated that the financial statements provided by Petrohawk to the SEC, investors, and others clearly declared that the Petrohawk entities continued to own the gathering system after the 2010 and 2011 transactions.

BPX filed its reply memo on February 25, 2021. BPX argued that its evidence showed that all costs were incurred after June of 2011. BPX noted that although the invoices were billed to Petrohawk and BHP Billiton (TXLA Operating) Company, BPX was defined collectively with those entities as "shipper" in the Kinderhawk agreement. Petrohawk was designated as BPX's representative to receive and pay invoices on its behalf.

BPX further argued that although Rives tried to confuse the issue by citing the way in which the divestment was treated for financial reporting purposes, the evidence showed that a sale did occur. The 2014 financial report merely stated that the divestment was treated as a failed sale for financial reporting purposes. BPX maintained that any continuing involvement under the Kinderhawk agreement did not rise to the level of an affiliation or beneficial interest between BPX and Kinderhawk.

BPX moved to strike Dean's report and the internal memo on the grounds that the memo was inadmissible hearsay and not properly authenticated, and the report was not proper summary judgment evidence.

13

*June 28, 2021 hearing*

The trial court heard the motions for partial summary judgment on June 28, 2021. The court began the hearing by telling the parties that it could not find Rives' opposition to the Kinderhawk motion. The court then moved to hear argument on the treating motion. The court concluded that paragraph 28 was very clear and there was no ambiguity. Paragraph 28 listed the costs that could not be charged, and treating was not mentioned there. The court granted the treating motion for partial summary judgment.

The court next heard argument on the transportation motion. The trial court stated it did not read *Freeland v. Sun Oil Co.*, 277 F. 2d 154 (5 Cir. 1960), *cert. denied*, 364 U.S. 826, 81 S. Ct. 64, 5 L. Ed. 2d 55 (1960), to say that only costs which increase the value of the gas can be deducted. The court also added that it found nothing in the law requiring the gas to go to the nearest market. The court granted the transportation motion for partial summary judgment.

Turning to the Kinderhawk motion, the trial court stated that as it had mentioned earlier during that hearing, it could not find Rives' opposition. The court told the parties that they could argue the motion that day if they wanted, but it was not going to rule on the motion that day as it would be unfair to rule without first reading Rives' opposition. Rives' counsel responded that he was happy to argue that day.

The court heard argument on whether the internal memo and John Dean's expert report should be struck from Rives' opposition. The memo was apparently produced by BPX in a 21,000-page document dump. The court granted BPX's motion to strike the exhibits.

14

The court then moved to the merits of the Kinderhawk motion. It told Rives to refile its opposition with nothing new added. The court ruled that BPX had no affiliation with Kinderhawk as of June of 2011, nor was it receiving any beneficial interest. The court noted it was giving plain meaning to Paragraph 28. The court concluded that BPX was an unaffiliated company to Kinderhawk, there was no beneficial interest, and the charges were incurred by BPX. The Kinderhawk motion for partial summary judgment was granted.

Addressing the Chesapeake motion, the court reiterated that paragraph 28 was clear and unambiguous. The court concluded that given the plain meaning of the words in paragraph 28, it was evident that BPX, Chesapeake, the Chesapeake gas gatherers, and the TIK gas gatherers were separate and unaffiliated corporate entities in which BPX had no beneficial interest or parent-subsidiary relationship that would justify including them in the cost-prohibition clause. Therefore, the Chesapeake motion for partial summary judgment was granted.

Rives then reminded the court that it had not reviewed its opposition to the Kinderhawk motion. The court responded that out of fairness to Rives, it would "scratch" its ruling and read the opposition. The court put the matter back on the docket for ruling at a later date.

***Motion to strike***

On June 29, 2021, Rives filed its opposition into the record. The next day, BPX filed a motion to strike the internal memo and Dean's expert report from Rives' opposition. Even though the trial court had sustained

15

BPX's objections at the June 28 hearing, BPX wanted to renew its objections because the court could not find Rives' opposition in the record. On July 8, 2021, the court entered an order granting the motion to strike.

***Motion to supplement***

Rives filed a motion to supplement its opposition to the Kinderhawk motion with Dean's deposition and related exhibits. Opposing the motion, BPX noted that the supplemental evidence could have been presented with Rives' original opposition on February 16, 2021. In addition, BPX had raised evidentiary objections to the internal memo and Dean's report in its reply memo which was filed on February 22, 2021. A motion to reset the summary judgment hearing was filed two days later. Rives did not attempt to supplement its opposition prior to the June 28 hearing.

***Motion to reset oral argument on the Kinderhawk motion***

On July 7, 2021, Rives a filed a motion to reset the hearing on the Kinderhawk motion on the basis that the trial court did not have its opposition at the time of the June 28 hearing.

BPX argued in opposition to the motion that the trial court had suggested on June 28 to reset the hearing because it had not reviewed Rives' opposition, but Rives protested and advised the court that it wished to proceed. BPX also argued that the motion to supplement and the motion to reset oral argument were thinly veiled attempts to correct Rives' mistakes when opposing the Kinderhawk motion. BPX pointed out that Rives was aware of its evidentiary issues when BPX filed its reply brief on February 22, 2021.

Rives countered that it would not have proceeded on June 28 had it known that the court was going to rule that day despite not having the benefit of reviewing Rives' opposition. Rives also stated that because the court had not ruled on the Kinderhawk motion, the court had the discretion to supplement the summary judgment record and reset oral argument. Finally, Rives argued that its supplementation would be timely if the court reset oral argument. Included in its supplementation was an affidavit from John Dean.

### *Judgment on the Chesapeake, treating, and transportation motions*

On July 12, 2021, the trial court rendered judgment granting the Chesapeake, treating, and transportation motions for partial summary judgment.

### *September 27, 2021, hearing*

At this hearing, the court first entertained Rives' motion to supplement its opposition with Dean's deposition. The court stated that it never reset the argument on the Kinderhawk motion, but just wanted time to review Rives' opposition. The court also stated that it did not want to hear arguments on June 28 without reading the opposition, but the parties insisted on going forward. The court emphasized that the hearing on the Kinderhawk motion was not continued so more exhibits could be filed.

The court reasoned that the time for Rives to attach Dean's entire deposition was after BPX filed its supplemental memo with the deposition excerpts attached. The motion to supplement the record was denied.

The court then considered the motion to reset oral argument on the Kinderhawk motion. Rives argued that had it known that rulings would be

17

made without benefit of its opposition, it would not have moved forward with argument on the Kinderhawk motion. The court stated that Rives was trying to argue its opposition to the Kinderhawk motion under the guise of arguing for an opportunity to reargue. The motion to reargue the Kinderhawk motion was denied.

Addressing the Kinderhawk motion for partial summary judgment, the court stated that the only question remaining was whether or not BPX was an affiliate or received some beneficial interest from Kinderhawk. The court did not see anything in the opposition that would raise a question of fact as to the affiliation of BPX with Kinderhawk, or that it had a beneficial interest in Kinderhawk. The court then read the definition of "affiliate" from Black's Law Dictionary. The court concluded there was nothing in the opposition indicating that BPX was an affiliate or had a beneficial interest in Kinderhawk, which would create an issue of fact. The Kinderhawk motion for partial summary judgment was granted.

On January 21, 2022, a judgment was rendered which granted the Kinderhawk motion for partial summary judgment and dismissed with prejudice all of Rives' claims against BPX for (1) the recovery of any gathering, treating, and fuel charges under BPX's gas gathering agreement with Kinderhawk for the production month beginning June 1, 2011, and thereafter, or (2) relief arising out of BPX's gas gathering agreement with Kinderhawk.

***Motion to vacate***

On February 2, 2022, Rives filed a motion to vacate the judgment granting BPX's Kinderhawk motion for partial summary judgment. In the

18

alternative, Rives requested a new trial. Citing *Zapata v. Seal*, 20-01148 (La. 9/30/21), 330 So. 3d 175, Rives argued that when ruling on a motion to vacate a prior summary judgment, a trial court is required to consider otherwise admissible evidence which was not submitted in opposition to the underlying motion for summary judgment. This includes evidence that was available to oppose summary judgment but was not used.

BPX countered that the trial court was not required under *Zapata* to consider Dean's deposition. It was in the court's discretion whether or not to do so, and the court had already exercised its discretion and declined to consider it. BPX characterized the motion to vacate as frivolous because Rives had Dean's deposition and either chose not to use it or forgot about it. BPX complained that a motion to vacate is not a device to provide a party with multiple opportunities to compensate for poor tactical decisions. BPX noted that in *Auricchio v. Harriston*, 20-01167 (La. 10/10/21), 332 So. 3d 660, the Louisiana Supreme Court confirmed that the deadline to oppose a motion for summary judgment is mandatory, and the trial court lacks the discretion to consider late-filed briefs.

Rives replied that while the trial court has discretion over whether to grant the motion to vacate, under *Zapata* it lacks discretion over whether to consider the motion and the supporting evidence. It does not matter under *Zapata* whether or not the evidence submitted with the motion to vacate is new. Rives noted that *Auricchio* dealt with a late-filed opposition to a motion for summary judgment, not a motion to vacate.

19

A hearing on the motion to vacate was held on April 25, 2022. The court denied the motion. A judgment denying the motion to vacate was signed on that date.

*Final judgment of dismissal*

A final judgment dismissing all of Rives' claims against BPX was rendered on May 5, 2022. Rives has appealed: (1) the May 5, 2022, final judgment granting the motion for entry of final judgment of dismissal; (2) the April 25, 2022, judgment denying the motion to vacate; (3) the January 21, 2022, judgment granting the Kinderhawk motion for partial summary judgment; (4) the July 12, 2021, judgment granting the treating, transportation, and Chesapeake motions for partial summary judgment; and (5) any and all interlocutory judgments, rulings, or orders, including evidentiary rulings, merged with the other judgments.

Rives argues on appeal that the trial court erred in: (1) granting the Kinderhawk motion; (2) excluding evidence submitted by Rives in opposition to the Kinderhawk motion; (3) denying the motion to vacate; (4) granting the transportation motion; (5) granting the Chesapeake motion; and (6) granting the treating motion.

## DISCUSSION-EVIDENTIARY MATTERS

*Evidentiary rulings*

Rives argues the trial court improperly excluded the internal memo and Dean's expert report. BPX argues the trial court made the correct ruling because the memo is inauthentic and inadmissible hearsay, and the report is incompetent summary judgment evidence.

20

The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of discretion. *Taylor v. Nexion Health at Pierremont, Inc.*, 54,802 (La. App. 2 Cir. 12/14/22), 353 So. 3d 403, *writs denied*, 23-00057 (La. 3/14/23), 357 So. 3d 823, 23-00056 (La. 3/14/23), 357 So. 3d 830.

In its reply memo to Rives' opposition to the Kinderhawk motion for partial summary judgment, BPX moved to strike the internal memo containing a "bhpbilliton" logo as well as the report from Dean.

The memo, which was produced from BPX's business records through discovery in a massive document dump, stated that the divestment was deemed to be classified as a failed sale and accounted for as a financing agreement for the purposes of financial reporting.

BPX argued that the memo was not properly authenticated and was inadmissible hearsay. Although the memo had the bhpbilliton logo and was submitted by BPX in discovery, its "To:" and "From:" fields were empty. It is unsigned, and because it does not have an author, it cannot be determined if the person who wrote it was qualified to write about its subject matter. It is unknown whether it was a draft or a final version.

Rives notes that the memo was produced from BPX's business records in response to discovery. It was dated November 28, 2011, around the same time as the divestment. Rives maintains that the memo also refers to the same failed sale and Kinderhawk transaction which are set out in Petrohawk's SEC filings.

Rives argues that the bhpbilliton logo is a means of self-authentication under La. C.E. art. 902(7). That article states, "Extrinsic evidence of

21

authenticity as a condition precedent to admissibility is not required with respect to . . . (7) Trade inscriptions and the like. Inscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control, or origin."

The mere fact that the internal memo bears the bhpbilliton logo is not sufficient to authenticate it. *See, In re Directech Southwest, Inc.*, 2009 WL 10663104 (E.D. La. 2009). It is the contents of the internal memo, not the trade inscription, logo, or letterhead, that Rives is seeking to be made admissible. Moreover, there is nothing in the record that the logo is purported to have been affixed in the course of business. There is no knowledge of why the document was created or who created it. In addition, "bhpbilliton" does not refer to a specific BHP Billiton entity.[1]

Citing La. C.E. art. 901(B)(3) for the proposition that the trier of fact may compare documents in evidence for purposes of authentication, Rives contends the logo on the memo matched the logo on a May 9, 2014, memo sent to foreign stock exchanges. Rives also argues that the memo is authenticated under La. C.E. art. 901(B)(4) because the substance of the internal memo identifies in detail the accounting treatment of the Kinderhawk transaction discussed in the stock exchange memo and the SEC filings. However, this does not address the lack of a writer or recipient on the internal memo.

BPX argues that even if authenticated, the memo remains inadmissible hearsay under La. C.E. arts. 801 and 802 as it is a written

---

[1] We note that while the "bhpbilliton" logo appears on the first page of the memo, the remaining pages present a "BHP Billiton Petroleum" heading at the left margin.

statement made by a declarant who cannot be identified.  Further, it does not fall under La. C.E. art. 803(6)'s business records exception because the necessary foundation was not established.

We agree with BPX and conclude that the trial court did not abuse its discretion in striking the internal memo from Rives' opposition.

BPX also argues that Dean's report was not proper summary judgment evidence as it did not fall within the narrow category of documents under La. C.C.P. art. 966(A)(4).

At the time of the hearing, La. C.C.P. art. 966(A)(4) stated:

> The only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. The court may permit documents to be filed in any electronically stored format authorized by court rules or approved by the clerk of the court.

The introduction of documents which are not included in this exclusive list, such as photographs, pictures, video images, or contracts, is not permitted unless they are properly authenticated by an affidavit or the deposition to which they are attached. *Jessie v. Wendy's Co.*, 22-156 (La. App. 5 Cir. 12/7/22), 356 So. 3d 467.

Rives counters that BPX selectively used excerpts from Dean's deposition in support of its Kinderhawk motion, and in those excerpts, Dean discussed his report.  Rives argues that it objected to BPX's selective use of Dean's deposition at the initial hearing on the Kinderhawk motion, and its objection should have been enough to permit the introduction of Dean's entire deposition with the attached report through the motion to supplement.

Although not assigned as error, Rives briefly argues the trial court erred in denying its motion to supplement the opposition with Dean's entire

23

deposition. Rives contends that allowing it to introduce the entire deposition was a matter of fairness.

We conclude the trial court did not abuse its discretion in striking Dean's expert report from Rives' opposition. The report was not attached to Dean's deposition or an affidavit executed by him. Rives' motion to supplement its opposition with Dean's entire deposition was also properly denied.

### *Motion to vacate*

Rives contends the trial court erred in not considering Dean's deposition before denying the motion to vacate. Rives argues that the trial court should not have treated the motion to vacate as a re-urging of its opposition to the Kinderhawk motion. The court was obligated to consider the deposition even though it was available at the time of the summary judgment hearing. According to Rives, Dean's deposition demonstrated questions of material fact as to whether the costs charged by BPX were actually incurred from a party in which BPX did not have a beneficial interest. Dean compared the relationship between BPX and Kinderhawk to the relationship of a trust beneficiary to a trust. He found that the Kinderhawk transactions enabled BPX to enjoy an ongoing benefit from property even though Kinderhawk has record title to it.

BPX responds that the trial court was well within its discretion to deny the motion to vacate in light of *Auricchio v. Harriston*, *supra.* BPX argues that Dean's deposition is more akin to the late-filed opposition in *Auricchio* than to the unavailable affidavit in *Zapata v. Seal*, *supra.* BPX adds that *Zapata* does not say what the trial court must consider or do when

24

ruling on a motion to vacate; rather, it only confirms that the decision on a motion to vacate rests fully within the court's discretion.

In *Zapata*, the trial court granted a motion for partial summary judgment because the plaintiffs failed to timely file an opposition. Twelve days before the summary judgment hearing, the plaintiffs attempted to attach a report from a physician that was dated a month earlier. The trial court agreed with the defendant that the opposition was untimely and should be struck. The plaintiffs then filed a motion to vacate with a recently executed affidavit from their physician attached. The trial court vacated the judgment. Although the expert affidavit was based on evidence that was previously available before the original summary judgment hearing, the Supreme Court found that the trial court was within its discretion in vacating the judgment.

"The plain language of La. C.C.P. art. 1915(B)(2) provides that, absent determination and designation as a final judgment, a partial summary judgment adjudicating less than all of the claims at issue 'may be revised at any time prior to the rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.'" *Id.* at p. 5, 330 So. 3d at 179. The Supreme Court recognized that finality can be reached by requesting that the trial court designate a partial summary judgment as final. Noting that such a remedy exists in the code, the *Zapata* court "decline[d] to adopt an interpretation of La. C.C.P. art. 1915(B) that would effectively amend the article to include the 'new evidence' standard of La. C.C.P. art. 1972(2)." *Id.* at p. 6, 330 So. 3d at 179.

La. C.C.P. art. 966 was amended by Act 317 of 2023, which had an effective date of August 1, 2023. Most relevant for our purposes is that subparagraph (B)(5) was added. It states:

> (5) Notwithstanding Article 1915(B)(2), the court shall not reconsider or revise the granting of a motion for partial summary judgment on motion of a party who failed to meet the deadlines imposed by this Paragraph, nor shall the court consider any documents filed after those deadlines.

We note that comment (e) to Act 317 states:

> (e) Subparagraph (B)(5) is new and would change the result reached by the Louisiana Supreme Court in *Zapata v. Seal*, 330 So. 3d 175 (La. 2021). This Subparagraph is intended only to prohibit a trial court from reconsidering the granting of a partial summary judgment because a document was not timely filed and served with an opposition in accordance with the deadlines imposed by this Article.

"In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary." La. C.C. art. 6.

Act 317 does not state whether the amendment at issue is to be applied retroactively or prospectively. Thus, a determination must be made whether the addition of (B)(5) is substantive, procedural, or interpretive. We note that Comment (f) states that the amendment to subparagraph (D)(2) was not intended to make substantive changes to the law.

Substantive laws establish new rules, rights, and duties or change existing ones. *Segura v. Frank*, 630 So. 2d 714 (La. 1994). Procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. *Id.* Interpretive laws merely

26

establish the meaning the interpreted statute had from the time of its enactment. *Id.*

When an existing law is not clear, a subsequent statute clarifying or explaining the law may be regarded as interpretive, and the interpretive statute may be given retrospective effect because it does not change, but merely clarifies, pre-existing law. *St. Paul Fire & Marine Ins. Co. v. Smith*, 609 So. 2d 809 (La. 1992). Interpretive legislation is sometimes said to legislatively "overrule" a prior judicial decision. *Id.*

Based upon comment (e) to Act 317, we conclude that the addition of subparagraph (B)(5) to La. C.C.P. art. 966 is an interpretive law which may be applied retroactively. Therefore, the trial court did not err in not considering Dean's deposition before denying the motion to vacate.

**DISCUSSION-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880. A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

Rives maintains that the Kinderhawk charges are not permitted deductions because BPX failed to establish there is no genuine issue of material fact that the charges were incurred by BPX, that the charges were

27

incurred from an unaffiliated third party, and that BPX does not have a beneficial interest in that third party.

Rives additionally argues that postproductions costs for transportation were improperly charged because the costs did not enhance the market value of the gas. Rives maintains these charges occur beyond the tailgate of the Kinderhawk gathering system and are different from the gathering and treating costs.

Rives further argues that BPX did not meet its burden of proof on the treating motion for partial summary judgment or on the Chesapeake motion for partial summary judgment.

*Kinderhawk motion*

In granting the Kinderhawk motion for partial summary judgment, the court dismissed with prejudice all claims of Rives against BPX for (1) the recovery of any gathering, treating, and fuel charges under BPX's gas gathering agreement with Kinderhawk for the production month beginning June 1, 2011, and thereafter, or (2) relief arising out of BPX's gas gathering agreement with Kinderhawk.

Rives maintains that the Kinderhawk charges fall outside the exception in paragraph 28 because: (1) the charges were not incurred by the lessee since BPX presented no evidence they were invoiced to or paid by BPX; (2) the charges were not incurred from unaffiliated third parties since the contract that permanently imposed the charges was with an affiliate of the lessee; and (3) BPX continued to enjoy a beneficial interest in the gathering company and gathering system as admitted in BPX's regulatory filings.

Rives argues that its summary judgment evidence showed: (1) the gathering costs were made permanent and binding on the lease in a lessee-affiliate transaction; (2) the gathering costs were not actually invoiced to or paid by BPX; (3) BPX retained a beneficial interest in the lessee and the gathering system; and (4) BPX did not deduct the costs for four years after purporting to sell the gathering system.

The general rules of contract interpretation apply when interpreting contracts involving mineral rights. *Culpepper v. EOG Resources, Inc.*, *supra*.

Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. *Prejean v. Guillory*, 10-0740 (La. 7/2/10), 38 So. 3d 274. Common intent is determined in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. *Id.* Most importantly, a contract must be interpreted in a common sense fashion, giving to the words of the contract their common and usual significance. *Id.*

When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning; words of art and technical terms must be given their technical meaning when the contract involves a technical matter. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. A provision susceptible of different meanings

must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. art. 2049.

Rives argues that BPX's course of conduct after 2011 weighs against the Kinderhawk motion in that BPX did not deduct gathering costs for four years after Petrohawk allegedly sold its entire interest in Kinderhawk. A doubtful contract provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. Relying on La. C.C. art. 2046, BPX counters that the court should not consider BPX's conduct of not initially charging postproduction costs as evidence of the parties' intent.

In finding that BPX is an unaffiliated company to Kinderhawk and that there was no beneficial interest, the trial court relied on the Texas bankruptcy case of *In re Goodrich Petroleum Corp.*, *supra*, to define "unaffiliated" and "beneficial interest." Rives argues this reliance was misplaced.

An identical clause to paragraph 28 was at issue in *Goodrich*. Coushatta Bayou Land Company entered into a mineral lease on land in Louisiana with Goodrich. BHP Billiton Petroleum ("Petroleum") was the operator for the lease and drilled wells on Coushatta's property. Coushatta, whose royalty payments were proportionately reduced by Petroleum's production costs, filed an adversary proceeding in which it alleged that Goodrich improperly withheld royalty payments. Coushatta maintained that Goodrich was affiliated with and held a beneficial interest in Petroleum based on marketing and contractual relationships. Goodrich responded that

30

its business transactions with Petroleum were arm's-length negotiations between separate companies without an affiliate relationship or beneficial interest.

The court in *Goodrich* noted that although the parties agreed that the terms of the royalty clause were unambiguous, they differed regarding the proper interpretation of those terms, namely "unaffiliated Third Parties" and "beneficial interest." The court found it important to recognize that Coushatta was not alleging that Goodrich received any preferential treatment from Petroleum. The court considered that the lack of any preferential treatment by Petroleum to Goodrich tended to demonstrate the absence of any affiliation, as well as destroy any equitable argument that Coushatta was being treated unfairly.

Coushatta maintained that Petroleum fell outside of the production costs exception because, based on the unitization of the wells, Petroleum became affiliated with everyone in the unit and produced wells for the benefit of itself and all other stakeholders in the units. Goodrich countered that Goodrich and Petroleum were separate corporate entities and fell within the production costs exception.

For the definition of "affiliate," the *Goodrich* court looked to Black's Law Dictionary (10th ed. 2014), which stated it was "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." The court concluded that this definition was in accord with Goodrich's interpretation of the term because Goodrich and Petroleum were separate corporate entities and had no parent-

subsidiary relationship that would justify including Petroleum within the exception.

Coushatta looked to Merriam Webster for a definition of "unaffiliated," which it defined as "not closely associated with, belonging to, or subordinate to another, not affiliated." The court considered this definition as further support for Goodrich's argument that it was not affiliated with Petroleum because the use of "belonging to" and "subordinate" in Coushatta's definition of "unaffiliated" indicated control between affiliated entities that was not present between Petroleum and Goodrich.

The *Goodrich* court concluded that the term "unaffiliated" was unambiguous in the context of the lease and required that control existed between entities before Coushatta received its royalty free of production costs. The court found no need to consider any uses of "unaffiliated" beyond the plain meaning in the lease.

The *Goodrich* court next considered the meaning of "beneficial interest" in the royalty provision. Coushatta argued that Petroleum's possession of oil and gas produced from the wells as well as Petrohawk's (Petroleum's affiliate and agent) marketing agreements with Goodrich demonstrated such a beneficial interest. The court again turned to Black's Law Dictionary, which defined "beneficial interest" as a "right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing." That source further stated that the "term is commonly employed by trusts to allow the use of trust property or income while legal title to such property remains with the trust."

32

The *Goodrich* court noted that Coushatta adopted an overly broad view of "beneficial interest" as, according to its definition, a beneficial interest holder does not have legal title to the property. The court rejected this argument because Goodrich had an ownership interest in the oil and gas produced by Petroleum from the wells in question. The court concluded that Goodrich had no beneficial interest in Petroleum as Goodrich had legal title to the production. Further, although Petrohawk and Goodrich had a contractual relationship that obligated Petrohawk to market gas on behalf of Goodrich, the court found that such a contractual relationship was distinguishable from the beneficiary and trustee relationship contemplated by the holder of a beneficial interest.

Rives argues that the *Goodrich* court narrowly defined "unaffiliated" by relying on illustrative examples of "affiliated" such as a subsidiary or parent corporation relationship. Rives urges that "affiliated" is broader than just corporate relationships as it recognizes a relationship through means of control. Rives next argues that "beneficial" and "interest" must be given their generally prevailing meaning since they are not technical or defined terms. Rives insists that confining the definition of "beneficial interest" to trust law concepts runs afoul of La. C.C. art. 2047.

We now turn to a consideration of the elements under paragraph 28.

Rives contends that the gathering charges were not incurred from an unaffiliated third party because the charges were incurred when the Rives lease became irrevocably dedicated to the gas gathering agreement in 2010. At that time, Kinderhawk was a BPX affiliate. Rives urges that a real obligation binding on all subsequent owners was created when the lease was

33

dedicated to the gas gathering agreement and a covenant running with the lease was declared. According to Rives, at that point, the Rives lease was made subject to the costs in the Kinderhawk gas gathering agreement and the obligation to pay those costs was incurred.

Rives maintains that BPX and Petrohawk dedicated the lease to an affiliated gathering company, created a perpetual obligation for the lease to bear the affiliated costs, passed those costs to Rives, and profited greatly when it sold its interest in the gathering system. In conclusion, Rives urges that even if paragraph 28 does not unambiguously preclude the charges as incurred from an affiliate, summary judgment is still inappropriate because, at minimum, the meaning of incurred within the lease is ambiguous.

Rives next argues that even if the gathering costs were only incurred when they were invoiced and paid, the evidence shows that the costs were not invoiced to BPX or paid by BPX. The invoices show the costs were billed to Petrohawk Operating Company or BHP Billiton (TXLA Operating) Company. Rives maintains that even if BPX had a disclosed agent, that is not dispositive of the actual incurrence of the costs as there is no evidence that BPX paid for the costs.

BPX responds that any issue regarding ambiguity in the term "incurred" was not raised before the trial court. Nevertheless, the trial court found no ambiguity in the term, and Rives' expert, Wellborn, never expressed any confusion or ambiguity as to how the term "incurred" was used in the lease or how it related to postproduction costs.

Regarding when costs were incurred, BPX argues they were incurred on a monthly basis. In support of its argument, BPX cites *Hoffman v.*

*Travelers Indem. Co. of Am.*, 13-1575 (La. 5/7/14), 144 So. 3d 993, where the Louisiana Supreme Court stated that an expense was "incurred" under an insurance policy's medical payments provision when one has paid it or become legally obligated to pay it. In this matter, Kinderhawk sent a statement each month listing the charges for gathering, treating, and fuel from the prior month. BPX explains that Rives' argument that the charges were incurred in 2010 is even more absurd considering that five of the six wells drilled by BPX did not exist at that time.

Rives counters that the agency relationship from the gas gathering agreement only shows that BPX had the potential to incur costs, not that it actually incurred them.

Finally, BPX asserts that the uncontroverted evidence shows that BPX incurred the Kinderhawk costs. The invoices reflect that they are addressed to BPX's expressly designated agent for the receipt and payment of the invoices. BPX points to a provision in the Kinderhawk agreement stating that the shipper, which is BPX, designated Petrohawk Operating Company as its representative to receive and pay invoices on its behalf. In BPX's view, Petrohawk's conduct in receiving and paying the invoices on behalf of BPX is legally imputed to BPX.

Moving on to the other elements, Rives next contends that BPX held a beneficial interest in or remained affiliated with Kinderhawk and the gas gathering agreement after 2011. Rives argues that the increased value received for the gas gathering system was because of the dedication of leases and the locking in of escalating gathering fees for large minimum volume commitments. Rives notes that in reports to the SEC and shareholders,

35

Petrohawk represented that the Kinderhawk transactions were a financing obligation that would entail extended continuing involvement and would be accounted for as a failed sale. Reduction of the financing obligation would be tied to the gathering and treating services.

In Rives' view, Petrohawk borrowed $1.7 billion, put the leases and gathering system up as collateral, retained an economic interest in the gathering system, and obligated itself to repay the loan through the gathering fees imposed on its leases.

Rives argues that even under the narrow *Goodrich* interpretation of "beneficial interest," a genuine issue of material fact remains because Petrohawk's admission of an ongoing financial involvement in Kinderhawk and the gas gathering system was sufficient to be a beneficial interest.

BPX points out that the definition of "affiliate" offered by Rives is selectively quoted as the full Merriam Webster definition is "closely associated with another typically in a dependent or subordinate position." BPX argues the control element is lacking. Dakota Clark stated in his affidavit that BPX was never under common control with Kinderhawk after June of 2011. BPX adds that the only evidence in the record shows that following the 2011 divestment, BPX was never under common control with Kinderhawk nor was there any parent-subsidiary or sibling-corporate relationship between BPX and Kinderhawk or KMG. BPX did not have a right or interest in Kinderhawk as an entity, and BPX had nothing more than an arm's-length contractual relationship for services with Kinderhawk.

BPX next argues that it did not have a beneficial interest in Kinderhawk as of June of 2011. BPX points out that Rives also selectively

quotes "beneficial" from Merriam Webster. The second portion of the definition from that source is "receiving or entitling one to receive advantage, use, or benefit." An example given is "a beneficial interest in an estate."

BPX also asserts that there is no evidence that BPX itself ever received any monetary benefit from the Kinderhawk transactions or the Kinderhawk charges. BPX complains that Rives is attempting to use an alleged financing obligation owed by BPX's parent company to establish a beneficial interest in Kinderhawk after June of 2011. BPX maintains that even if the Kinderhawk transactions were a loan, a financing obligation is the opposite of a benefit or beneficial interest. BPX likens it to a person with a bank loan not having a beneficial interest in the bank.

The example by BPX is not persuasive. A more accurate illustration would be the owner of 50% of a bank borrows against his interest in the bank many times the value of that interest. He is also a 50% owner when the terms of the financial agreement are negotiated.

Rives' burden of proof at trial would be to establish that the postproduction costs were: (1) not incurred by BPX; or (2) if incurred by BPX, incurred from a third party affiliated with BPX; or (3) if incurred by BPX from an unaffiliated third party, BPX had a beneficial interest in that party. To defeat the Kinderhawk motion for partial summary judgment, Rives had only to establish a genuine issue of material fact that the charges were not incurred by BPX, or that the charges were incurred from an affiliated third party, or that BPX had a beneficial interest in that third party. We note that BPX was seemingly dismissive of the incurrence element, as it

37

stated that the Kinderhawk motion "was expressly premised on the lack of any affiliated or beneficial interest in Kinderhawk by [BPX.]"

Even without the internal memo and Dean's report, the evidence submitted by Rives in opposition to the Kinderhawk motion was sufficient to create a genuine issue of material fact concerning the beneficial interest element.

The form 10-K for 2010 filed by Petrohawk Energy with the SEC stated that Petrohawk recorded a deferred gain of approximately $719 million from entering into the Kinderhawk joint venture in 2010.

The form 10-K for 2011 filed by Petrohawk Energy with the SEC stated that the Kinderhawk joint venture was "accounted for as a failed sale of in substance real estate," and that the gas gathering agreement "constitute[d] extended continuing involvement[.]"  The form also stated, "As a result of the failed sale, we recorded a financing obligation, representing the proceeds received, under the financing method of real estate accounting."  The financing obligation was approximately $1.7 billion as of December 31, 2011.  Finally, the form stated, "Reductions to the obligation and the non cash interest on the obligation are tied to the gathering and treating services, as we deliver natural gas through the Haynesville Shale gathering and treating system."

Petrohawk's March 2014 quarterly financial report to security holders stated:

> Due to the gathering agreement entered into with the formation of KinderHawk, which constitutes extended continuing involvement under ASC 360-20, it has been determined that the contribution of the Company's Haynesville Shale gathering and treatment system to form KinderHawk is accounted for as a failed sale of in substance real estate.  Under the financing

method for a failed sale of in substance real estate, on May 21, 2010, the Company recorded a financing obligation on the unaudited condensed consolidated balance sheets in "Payable on financing arrangements," in the amount of approximately $917 million. Reductions to the obligation and the non-cash interest on the financing obligation are tied to the gathering and treating services, as the Company delivers natural gas through the Haynesville Shale gathering and treating system.

Petrohawk also noted in its financial report that on July 1, 2011, it transferred its remaining 50% membership interest in Kinderhawk to KMG. "As a result of the transfer on July 1, 2011, the Company recorded an increase in its financing obligation associated with Kinderhawk of approximately $743 million."

The SEC filings and the quarterly financial report were sufficient to defeat the motion for summary judgment by raising a genuine issue of material fact regarding Petrohawk's alleged divestment of its interest in the Kinderhawk gas gathering system. They show that BPX has a continuing economic connection to the Kinderhawk gathering system, which BPX benefits from even though Kinderhawk possesses record title. Benefits from the system received by BPX's parent company are attributable to BPX.

Because we find that there is a genuine issue of material fact surrounding the beneficial interest element, it is unnecessary to address the correctness, or not, of the trial court's findings on the incurrence and affiliate elements. The trial court erred in granting the Kinderhawk motion for partial summary judgment.

### Treating motion

Rives argues that the trial court erred in granting the treating motion for partial summary judgment. In granting the treating motion, the trial

39

court dismissed with prejudice all claims against BPX seeking to recover the costs of treating gas.

Rives points out that Paragraph 28 prohibited deductions related to costs "in connection with the production, compression, gathering and transportation costs[.]" Rives maintains that a reasonable inference can be made that the parties intended to prohibit all postproduction costs, including treating costs, because treating costs are necessarily incurred "in connection" with the enumerated services. Rives adds that at minimum, the clause is ambiguous on this point because it is susceptible to more than one interpretation regarding whether treating costs are excluded.

BPX counters that the treating motion was properly granted because the lease did not prohibit treating costs. BPX notes that Rives' own experts agreed that treating costs are distinct from the separate category of gathering costs. Dean testified that the gathering and treating rates are usually defined separately in a gas gathering agreement. Wellborn testified that the treating charge is separate from the gathering charge in this matter. BPX also accuses Rives of attempting to rewrite the lease by including treating costs as one of the enumerated categories.

Unless the parties agree otherwise, the cost of marketing gas once it has been produced is shared by the lessor and lessee under a market-value lease. *Merritt v. Southwestern Elec. Power Co.*, 499 So. 2d 210 (La. App. 2 Cir. 1986).

Gas gathering systems were explained by the 10th Circuit in *Duke Energy Natural Gas Corp. v. C.I.R.*, 172 F. 3d 1255, 1256 (10 Cir. 1999):

> Gathering systems generally consist of interconnected subterranean natural gas pipelines and related compression

40

facilities that collect the raw gas from wells and deliver it to a central point, such as a processing plant. The gas is transferred from the well owner's separator to gathering systems either where the gathering systems connect with the gas separation facilities, or at a common field point at which raw gas from multiple fields is gathered. Once gathered, the gas is treated in most instances by a processing plant, which produces both commercially marketable "pipeline quality" gas and separated NGLs, which can also be sold profitably.

"Post-production costs are those costs and expenses incurred after the production has been discovered and delivered to the surface of the earth. Such 'subsequent to production' costs generally include those related to taxes, transportation, processing, dehydration, treating, compression, and gathering." *J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake La., L.P.*, 15-2461, 2018 WL 1463529, at 6 (W.D. La. 3/22/18). The general rule in Louisiana is that post-production costs are shared *pro rata* unless a lease says otherwise. *Id.*

We find that the trial court did not err in granting the treating motion for partial summary judgment. Treating costs are nowhere mentioned in paragraph 28's cost exclusion. It is not the province of the court to alter by construction or to make new contracts for the parties. *Peironnet v. Matador Resources Co.*, 12-2292 (La. 6/28/13), 144 So. 3d 791. Further, as stated by BPX, treating is not incidental or in connection with gathering because treating occurs after gas is gathered, and not all gathered gas is treated.

*Transportation costs*

When granting the transportation motion, the court dismissed with prejudice all claims against BPX that were based on the contention that (1) the reconstruction approach to market value is limited to the nearest market

41

for gas, or (2) Louisiana law requires that postproduction costs must enhance or increase the value of gas to be deductible.

Rives contends the trial court erred in granting the transportation motion. Rives argues the issue presented is whether the reconstruction method of determining a royalty price under a "market-value at the well" lease allows a lessee to deduct from royalty payments costs that have no bearing on the ultimate value of the minerals sold.[2] The transportation services represented by these charges are alleged to have occurred beyond the tailgate of the Kinderhawk gathering system.

Rives agrees that the lease's base royalty clause requires payment for gas based on the market value at the well. However, Rives maintains that BPX charged transportation costs which far exceeded the increased market value by transporting the gas to more remote sales locations.

As stated earlier in the opinion, unless the parties agree otherwise, the cost of marketing gas once it has been produced is shared by the lessor and lessee under a market-value lease. *Merritt v. Southwestern Elec. Power Co.*, *supra*.

Although Rives states in brief that the trial court's ruling was a matter of law, Rives maintains that it presented evidence showing there remained a fact issue whether certain transportation costs enhanced the value of the gas. Attached to its opposition were its expert Jeff Wellborn's report and excerpts from his deposition. Wellborn concluded that most of the transportation

---

[2] The parties contested at the trial court whether the reconstruction approach was limited to the nearest market for gas. This element was not briefed by the parties as they focus on appeal on whether there is an enhanced value requirement. Rives relied on *Sartor v. United Gas Public Service Co.*, 84 F. 2d 436 (5 Cir. 1936) for the nearest market requirement. We find that case unpersuasive.

charges were excessive, unreasonable, unusual, inappropriate, and contrary to custom and practice because the charges significantly exceeded any increased sales price.

BPX contends that when there is no market for gas at the well, the reconstruction approach is used. BPX adds there is no requirement under Louisiana law that there be an enhanced value in order for transportation costs to be deductible, and there is no such requirement in the lease.

Louisiana courts have used a reconstruction approach to determine market value. *Merritt v. Southwestern Elec. Power Co.*, *supra*. Market value is reconstructed by starting with the gross proceeds from the sale of the gas and deducting any additional costs of taking the gas from the wellhead to the point of sale. *Id*.

Since marketing the minerals benefits both the lessee and the royalty owner, the royalty owner should bear a proportionate share of the marketing costs. *Merritt v. Southwestern Elec. Power Co.*, *supra*. Production is futile without distribution of the product. *Id*.

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. La. R.S. 31:122.

There is an implied obligation in La. R.S. 31:122 to market diligently the minerals discovered and capable of production in paying quantities in the manner of a reasonable, prudent operator. *Frey v. Amoco Production Co.*, 603 So. 2d 166 (La. 1992). Encompassed within the lessee's duty to market diligently is the obligation to obtain the best price reasonably possible. *Id.*

Rives contends that a lessee violates this duty to act for mutual benefit when it deducts costs from the royalty for services which only benefit the lessee. However, transporting the gas benefited Rives and BPX.

Rives cites *Cimarex Energy Co. v. Chastant*, 537 Fed. Appx. 561 (5 Cir. 2013) for the position that courts applying Louisiana law have recognized that costs which do not affect the market value of gas play no role in reconstructing market value. The *Cimarex* court found that the lessee's hedging transactions were purely financial and did not affect the market value. There was no contention that hedging was a postproduction cost.

Rives also cites *Freeland v. Sun Oil Co.*, *supra*, where the court stated:

> To put it another way: in the analytical process of reconstructing a market value where none otherwise exists with sufficient definiteness, all increase in the ultimate sales value attributable to the expenses incurred in transporting and processing the commodity must be deducted.

*Id.* at 159.

Rives argues that the implication from *Freeland* is that costs of the lessee which do not contribute to any increase in the value of gas cannot be included in a netback calculation. However, we note the preceding sentence in *Freeland*, which stated: "It stands for the proposition that in determining market value costs which are essential to make a commodity worth anything or worth more must be borne proportionately by those who benefit." *Id.* at 159.

The presence of gas at the wellhead is of no value until it is marketed and transported to the purchaser. *Culpepper v. EOG Resources, Inc.*, *supra*.

Thus, the commodity gas is not worth anything if is not transported from the wellhead. *Freeland* does not stand for the proposition that enhanced value is a requirement for deducting a postproduction cost.

Finally, Rives cites *Texaco Inc. v. Duhe*, 274 F. 3d 911 (5 Cir. 2001), for the argument that the lessee has the duty to obtain the best price reasonably possible. Citing *Frey*, the court stated that Louisiana law imposes a duty on producers to exercise reasonable diligence in securing a market for the gas they produce, including obtaining the best price reasonably possible.

We note that pursuant to the lease, Texaco promised to pay royalties on the basis of the "reasonable value" of the natural gas. Additionally, we conclude that "best price reasonably possible" is not always going to be synonymous with "enhanced value."

The parties in this matter did not negotiate for an enhancement clause or enhancement requirement for postproduction costs in the lease. We also emphasize that gas at the wellhead has no value until it is marketed and transported.

We conclude that because there is no requirement under Louisiana law that postproduction costs enhance the value of the gas, the transportation motion for partial summary judgment was properly granted.

***Chesapeake motion***

The Chesapeake motion for partial summary judgment concerned postproduction costs from Chesapeake-operated wells that BPX passed on to Rives.

The trial court concluded that Chesapeake was a separate and unaffiliated corporate entity in which BPX had no beneficial interest, and there was no parent-subsidiary relationship that would justify including Chesapeake in paragraph 28.

Rives notes that the Chesapeake motion is different from the other motions for partial summary judgment because the costs were incurred on Chesapeake-operated units where BPX was a non-operating lessee, making it akin to the facts in *Goodrich*. Production from the Chesapeake-operated wells was placed in the Mansfield gas gathering system, which is owned by subsidiaries or affiliates of Chesapeake.

Rives argues that if costs received by an agent are imputed as incurred by BPX, such as argued by BPX on the Kinderhawk motion, then Chesapeake serves as BPX's agent in operating and holding BPX's leases in those wells. Thus, Rives continues, Chesapeake's actions in applying affiliated costs should be imputed to BPX.

In summary, Rives' argument is that Chesapeake acts as BPX's agent for the purpose of holding BPX's rights in the lease. In other words, Chesapeake's costs incurred with its own affiliate cannot be charged through BPX to Rives under paragraph 28.

BPX responds that it established that it has no affiliated or beneficial interest in Chesapeake or any of the midstream companies which charged postproduction costs on the Chesapeake-operated wells. This is in line with the reasoning in *Goodrich*. BPX has never been under common control with Chesapeake or its service providers, and no parent-subsidiary or sibling-corporate relationship has ever existed between BPX, Chesapeake, or its

service providers. BPX has never had a right or interest in Chesapeake or its service providers. It is entirely separate from those companies and only had an arm's-length third-party relationship with any of them. Finally, BPX contends that Rives is not aided in its argument by the agency relationship existing between Petrohawk and BPX regarding the incurrence of postproduction costs as that agency relationship was the result of an express contractual designation.

We conclude that there is no genuine issue of material fact that the postproduction charges from the Chesapeake-operated wells were not incurred by BPX from unaffiliated third parties in which BPX did not have a beneficial interest. The Chesapeake motion for partial summary judgment was properly granted.

## CONCLUSION

For the foregoing reasons, we reverse the January 21, 2022, judgment which granted the Kinderhawk motion for partial summary judgment and dismissed with prejudice all of Rives' claims against BPX for (1) the recovery of any gathering, treating, and fuel charges under BPX's gas gathering agreement with Kinderhawk for the production month beginning June 1, 2011, and thereafter, or (2) relief arising out of BPX's gas gathering agreement with Kinderhawk. We also reverse the final judgment of dismissal insofar as it incorporated the judgment granting the Kinderhawk motion for partial summary judgment.

In all other respects, the final judgment of dismissal is affirmed. This matter is remanded to the trial court for further proceedings. BPX is to bear one-quarter of the costs of this appeal.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.**